

# TAX COURT OF NEW JERSEY

**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

February 6, 2023

Robert F. Giancaterino, Esq.
Skoloff & Wolfe, P.C.
293 Eisenhower Parkway, Suite 390
Livingston, New Jersey 07039

Nylema Nabbie, Esq.
Cleary Giacobbe Alfieri Jacobs, LLC
169 Ramapo Valley Road, UL 105
Oakland, New Jersey 07436

> Re:  Canterbury at Cedar Grove, LLC v. Cedar Grove Township
> Docket Nos. 003975-2016, 002056-2017, 001868-2018,
> 003136-2019 and 003470-2020

Dear Mr. Giancaterino and Ms. Nabbie:

This letter constitutes the court's opinion following trial of the local property tax appeals filed by plaintiff, Canterbury at Cedar Grove, LLC ("Canterbury"). Canterbury challenges the 2016, 2017, 2018, 2019, and 2020 tax year assessments on its improved property located in Cedar Grove Township ("Cedar Grove").

For the reasons stated more fully below, the court reduces the 2016, 2017, 2018, 2019, and 2020 local property tax assessments.

## I.  **Procedural History and Factual Findings**

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony offered during trial.

As of each valuation date, Canterbury was the owner of the real property and improvements located at 398 Pompton Avenue, Cedar Grove Township, Essex County, New Jersey (the "subject






property"). The subject property is identified on Cedar Grove's municipal tax map as block 110, lot 19. The subject property's lot comprises approximately 2.3359-acres.[1] Vehicular ingress to and from the subject property is provided along Pompton Avenue, and West Bradford Avenue, under a fifty-foot right-of-way.

As of each valuation date at issue, the subject property was improved with a rectangular shaped masonry, four-story, 60,404 square-foot, licensed skilled nursing care facility, constructed in 1984. The facility offers sub-acute care, rehabilitation, long-term care, and other specialized care services. The facility consists of ninety-six (96) units/patient rooms and one-hundred eighty (180) care beds. The facility's ninety-six (96) units/patient rooms are allocated as follows: (i) twelve (12) private units/rooms, with full private bath; and (ii) eighty-four (84) semi-private units/rooms, each featuring a two-fixture bathroom.

The first floor of the facility includes the lobby, administrative offices, a conference room, meeting/dining room, physical therapy facilities, a kitchen, employee lounge, laundry area, storage areas, and a utility room.[2] The units/patient rooms are located along the perimeter of the second, third, and fourth floors of the facility. The second, third, and fourth floors each feature a core nursing station, two patient lounges/day rooms, common bath facilities, nursing staff offices, and medication rooms.

The building possesses a unique composition of heating and cooling systems.[3] Certain

---

[1] Cedar Grove's expert (as defined herein) offered that the subject property is 2.1308-acres.
[2] The subject property's lot is level with Pompton Avenue however, the property progressively slopes downward towards its western/rear boundary. Due to the downward sloping grade, portions of the building's first floor are: (i) at grade-level; (ii) partially above and partially below grade-level; and (iii) entirely below grade-level. Approximately 9,725 square feet of the first floor is located below-grade and approximately 5,430 square feet is at, or partially above, grade-level.
[3] The manner that certain areas of the building were heated and cooled was disputed.






areas of the building's first floor (the lobby, physical therapy area, conference room, administrative office, dining room/meeting room, employee lounge/restrooms) are heated with baseboard heating and cooled with a forced air system.[4] The core or central areas of the first floor (hallways, elevator area, kitchen) are heated and cooled with package units. The perimeter of the second, third, and fourth floors (the units/patient rooms and patient lounges/day rooms) are heated and cooled with in-room heat pumps.[5] The core or central areas of the second, third, and fourth floors (the nursing stations, corridors/hallways, common bath facilities) are heated and cooled with package units.

The building is serviced by two elevators, has a wet sprinkler/fire protection system, and possesses a backup emergency diesel generator that services only a portion of the building. The subject property contains approximately eighty (80) parking spaces allocated between two separate parking areas, one situated along the property's eastern boundary, and one situated along its western boundary.[6] In late 2018, the building experienced a fire resulting in renovations to approximately sixty (60%) percent of the first floor.[7]

---

[4] Canterbury's expert testified that the building's first floor is fully serviced with package heating and air conditioning and supplemented by baseboard heating. Cedar Grove's expert testified that the building's first floor is heated with hot water baseboard heat and cooled by forced air. Based on the experts' testimony and the photographs offered in evidence, the court finds that the core or central areas of the building's first, second, third, and fourth floors are heated and cooled with package units. However, the perimeter areas of the building's first floor are heated with hot water baseboard heat and the perimeter areas of the building's second, third, and fourth floors are heated and cooled with in-room heat pumps.

[5] Cedar Grove's expert identified these units as "individual electric PTAC units (packaged thermal air conditioner) providing heat and air conditioning within each patient room."

[6] Canterbury's expert testified that the subject property has sixty-three (63) parking spaces and Cedar Grove's expert testified that it contains eighty (80) parking spaces.

[7] Renovations were completed in April 2019, including improving facility access by modifying the entrance, expanding and upgrading the physical therapy facilities, lobby, waiting area, and restrooms, and the reapportionment and enhancement of offices and residential multipurpose rooms. In addition, minor renovations were made to the building's fourth floor nurses' station and hallways.






The subject property is in Cedar Grove's SL/C – Senior Living Care District, with principal permitted uses that include long-term care facilities such as nursing homes; planned retirement communities; community residences for the developmentally disabled; community shelters for victims of domestic violence; community residences for the terminally ill; and community residences for persons with head injuries. Thus, operation of a skilled nursing care facility on the site is legally permitted. However, because the property does not satisfy several bulk requirements, it is deemed a pre-existing, non-conforming, legally permissible use.

The property is serviced by public utilities, including municipal sewer and water, natural gas, electric, and telephone. The subject property is in Non-Special Flood Hazard Zone X, denoting an area of "minimal flood hazard."[8]

Canterbury timely filed complaints challenging the subject property's 2016, 2017, 2018, 2019, and 2020 tax year assessments. Cedar Grove did not file any counterclaims. The court tried these matters to conclusion over several days.

During trial, Canterbury and Cedar Grove each offered testimony from New Jersey certified general real estate appraisers, who were accepted by the court without objection, as experts in the property valuation field. Each expert prepared an appraisal report containing photographs of the subject property, supporting data, and expressing opinions of the subject property's true or fair market value as of the October 1, 2015, October 1, 2016, October 1, 2017, October 1, 2018, and October 1, 2019 valuation dates.

As of each valuation date, the subject property's local property tax assessment, implied equalized value, and the experts' value conclusions are set forth below:

---

[8] https://www.fema.gov/glossary/flood-zones






| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized value | Canterbury's expert | Cedar Grove's expert |
|---|---|---|---|---|---|
| 10/1/2015 | $11,250,000 | 95.43% | $11,788,746 | $8,800,000 | $12,130,000 |
| 10/1/2016 | $11,250,000 | 96.84% | $11,617,100 | $8,700,000 | $12,410,000 |
| 10/1/2017 | $11,250,000 | 96.74% | $11,629,109 | $8,400,000 | $12,440,000 |
| 10/1/2018 | $11,250,000 | 96.09%[9] | $11,707,774 | $8,200,000 | $12,755,000 |
| 10/1/2019 | $11,250,000 | 93.80% | $11,993,603 | $8,900,000 | $12,815,000 |

## II.     Conclusions of Law

### A.     Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity."  MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998).  "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous."  Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced."  Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. Pantasote Co., 100 N.J. at 413.  That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption."  Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952).  Thus, at the close of the proofs by the party challenging the tax assessment, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

At the close of Canterbury's proofs, Cedar Grove moved for dismissal, under R. 4:37-2(b).

---

[9]  Canterbury's expert's appraisal report and Canterbury's post-trial brief misstate Cedar Grove's 2019 average ratio of assessed to true value as 98.09%.  State of New Jersey Department of the Treasury Division of Taxation, Certification of Average Ratios and Common Level Ranges for use in the tax year 2019 (January 31, 2019).






Cedar Grove raised four principal arguments: (i) Canterbury's expert's valuation methodology, employing a gross building area to unit ratio (gross building area/number of units) and gross building area to bed ratio (gross building area/number of beds), was neither appropriate nor supported by legal precedent; (ii) Canterbury's expert's functional obsolescence deduction was not reliable and lacked market support; (iii) Canterbury's expert's physical depreciation deductions do not follow the CoreLogic Marshall and Swift Cost Manual depreciation tables; and (iv) Canterbury's expert's entrepreneurial profit factors were not reliable and lacked market support.

Affording Canterbury all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that Canterbury produced credible evidence sufficient to overcome the presumption of validity. The basis of Canterbury's expert's opinions, and the conclusions he derived therefrom, if accepted as true, raised debatable questions as to the validity of the subject property's local property tax assessments. Accordingly, the court denied Cedar Grove's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the local property tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the [party challenging the tax assessment] . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).






B.    Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use analysis is a concept rooted in the market's perceptions of value, because it answers the inquiry, "[w]hat use would the market make of that property?" Ford Motor Co., 127 N.J. at 302 (citation omitted). To accurately answer that question, an appraiser must conduct "a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses." Clemente, 27 N.J. Tax at 269. Thus, the highest and best use analysis is the starting point in the court's journey to discern a property's true or fair market value. See Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988) (concluding that the highest and best use analysis is "the first and most important step in the valuation process").

Here, both experts concluded that the subject property's highest and best use, as vacant and as improved, is for use as a skilled nursing care facility. The court finds the experts' testimony credible and that the evidence offered during trial supports their conclusions. Therefore, the court finds that the subject property's highest and best use as vacant and as improved, is as a skilled nursing care facility.

C.    Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of






income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985).

### 1. Cost approach

The cost approach derives a property's value "by adding the estimated value of the land to the current costs of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes." The Appraisal of Real Estate at 47. Thus, the cost approach consists of "two elements - land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 417 (Tax 2004).

The cost approach is a particularly effective valuation method when the property being appraised is new or when the site improvements are unique and designed for a special purpose. The Appraisal of Real Estate at 45. Often, the cost approach is the only reliable method of valuation of "special purpose or unique structures for which there is no market." Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980); see also Glenpointe Associates v. Township of Teaneck, 10 N.J. Tax 380 (Tax 1989), aff'd, 12 N.J. Tax 118 (App. Div. 1990). Generally, a special purpose property possesses the following characteristics: "(1) unique and specially built for the purpose for which they are used, (2) without a market or comparable sales, (3) unlikely to be converted without substantial economic expenditure, and (4) reasonably






expected to be replaced or reproduced if destroyed." TD Bank v. City of Hackensack, 28 N.J. Tax

363, 379 (Tax 2015).

Here, both experts concluded that the subject property is a special purpose property and

that the cost approach was the most appropriate method for determining the subject property's true

or market value. The court finds the experts' conclusions that the cost approach is the most

efficient and appropriate method for deriving an estimate of the subject property's true or market

value to be credible and supported by the evidence, as well as supported by established legal

precedent. See Twin Oaks Assoc. v. Town of Morristown, 9 N.J. Tax 386, aff'd, 11 N.J. Tax 94

(App. Div. 1989); Regent Care v. City of Hackensack, 27 N.J. Tax 138 (Tax 2013)[10]; 962 River

Avenue, LLC v. Lakewood Twp., 30 N.J. Tax 291 (Tax 2017); Eagle Rock Convalescent Ctr. v.

West Caldwell Twp., 32 N.J. Tax 122 (Tax 2021).

Although the experts agreed that the cost approach should be employed to arrive at the

subject property's true or market value, the experts parted ways in their analysis and application

of the appropriate units of comparison that should be embodied under the cost approach.

a. Canterbury's expert

According to Canterbury's expert, "[t]here have not been many new[][skilled nursing care]

facilities built in New Jersey over the past decade or more as the industry has undergone changes

in the types of facilities being built and changes in state and federal funding." In Canterbury's

expert's opinion, "the trend in skilled nursing/assisted living [facilities] is a movement toward

private rooms with significantly more [gross] square footage per patient bed." Thus, Canterbury's

expert reasoned that consideration of the gross building square footage and individual unit size is

---

[10] In Regent Care, the parties stipulated that the cost approach was the most "appropriate method
of valuation" and the court agreed. 27 N.J. Tax at 143.



Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE


a "significant [factor] when selecting an appropriate unit value from the land sales data analyzed in the cost approach."

Canterbury's expert further testified that, in general, older skilled nursing care facilities are smaller and possess "a higher room/bed density (greater number of rooms and beds) than a . . . more modern facility." According to Canterbury's expert, "[c]ompared to the overall industry the subject's gross building area per unit and per bed area is significantly smaller than typical sizes found within the industry." Relying on published data not affixed to the appraisal report, Canterbury's expert stated that more recently constructed skilled nursing facilities have an average gross building area, per patient bed, of 724 square feet (for each patient bed, the skilled nursing care facility has 724 square feet). Canterbury's expert emphasized that the subject property has a gross building area, per patient bed, of only 336 square feet, approximately one-half of the published average.[11] Thus, in Canterbury's expert's opinion, facilities like the subject property "suffer from functional obsolescence in terms of the [building's] square footage per patient bed."

According to Canterbury's expert, the average number of skilled nursing care facilities in New Jersey remained relatively unchanged between 2014 and 2020, ranging from 362 to 367 facilities, each having between 140 to 145 beds on average, and occupancy rates ranging from 81.6% to 86.9%. Here, Canterbury's expert expressed that the subject property's occupancy levels have ranged from 83.63% to 90.61% during the tax years at issue.

To determine the subject property's land value, Canterbury's expert identified nine land sales with approvals in place for either a skilled nursing or an assisted living/memory care facility. The nine sales transactions took place between June 2015 and March 2019 and were in Mercer

---

[11] During cross-examination Canterbury's expert admitted that he did not measure the square footage of the subject property's private and semi-private units/patient rooms.






County (2), Monmouth County (2), Bergen County (2), Middlesex County (1), Union County (1), and Essex County (1).  As recited above, Canterbury's expert's comparative analysis centered on the value per bed, value per unit/patient room, and value per square foot of building area, i.e., the "number of units[/patient rooms] including the reflected sales prices per patient/resident bed, per unit and on a price per square foot [of building area]."

According to Canterbury's expert, the unadjusted prices of the nine land sales ranged from: (i) $8,267 to $28,636 per patient bed; (ii) $10,333 to $37,059 per unit/patient room; and (iii) $14.27 to $41.41 per square foot of building area.  Canterbury's expert testified that he considered adjustments to the nine land sales for property rights, financing, conditions of sale, market conditions, size, location, approvals, topography, and access/visibility.  However, in his opinion, after reviewing the land sales no adjustments were warranted.

As of the October 1, 2015 and October 1, 2016 valuation dates, Canterbury's expert relied on land sales 1, 2, 3, 4, and 5.  Those land sales reflected a value range of: (i) $8,267 to $25,608 per patient bed, with an average of $18,499; (ii) $10,333 to $30,380 per unit/patient room, with an average of $20,007; and (iii) $14.27 to $36.92 per square foot of building area, with an average of $27.41.

As of the October 1, 2017 and October 1, 2018 valuation dates, Canterbury's expert relied on land sales 4, 5, 6, 7, and 8.  Those land sales reflected a value range of: (i) $11,194 to $28,636 per patient bed, with an average of $21,684; (ii) $13,514 to $37,059 per unit/patient room, with an average of $25,433; and (iii) $15.68 to $41.41 per square foot of building area, with an average of $31.08.

As of the October 1, 2019 valuation date, Canterbury's expert relied on land sales 5, 6, 7, 8, and 9.  Those land sales reflected a value range of: (i) $11,194 to $28,636 per patient bed, with






an average of $22,434; (ii) $13,514 to $37,059 per unit/patient room, with an average of $26,111; and (iii) $15.68 to $41.41 per square foot of building area, with an average of $33.71.

Canterbury's expert concluded that the following valuation units should be applied to the subject property in discerning its true or fair market value as of all dates involved herein: (i) $13,423 per patient bed; (ii) $25,168 per unit/patient room; and (iii) $40.00 per square foot of building area. Canterbury's expert explained that he primarily relied on "the price paid per square foot of building area, with a reasonableness check utilizing the price paid for land per licensed bed and the price paid per unit/[patient] room." In sum, Canterbury's expert concluded a land value for the subject property of $2,416,140, as of all valuation dates involved herein. Such value was computed as follows: (i) $13,423 x 180 patient beds = $2,416,140; (ii) $25,168 x 96 patient rooms = $2,416,128; and (iii) $40.00 x 60,404 square feet = $2,416,160.

Canterbury's expert further opined that the risk associated with "laying out capital for raw land in order to pursue approvals, which . . . involves the additional costs of subdivision along with approvals for the proposed development," must be accounted for in determining the subject property's true value. Because the owners/operators of skilled nursing care facilities often are responsible for acquiring and developing the land, Canterbury's expert opined that an owner/operator anticipates a return on investment from both the business venture and real property components of the project. Accordingly, Canterbury's expert concluded that an entrepreneurial profit on the "lower end of the range" was appropriate, applying a five percent (5%) entrepreneurial profit to his concluded land value, or $120,808 ($2,416,160 x 5% = $120,808).

Therefore, Canterbury's expert concluded that the subject property's land value, inclusive of the entrepreneurial profit incentive, as of all valuation dates herein, was $2,540,000 ($2,416,160 + $120,808 = $2,536,968).

   

To generate the replacement cost new estimate for the subject property's building, elevators, site improvements, and backup generator, Canterbury's expert employed the CoreLogic Marshall and Swift Cost Manual ("Cost Manual") and principally, Section 15 "Nursing Homes (Convalescent Hospitals)" therein. Canterbury's expert categorized the subject property's building as a 60,404 square foot, four-story, brick exterior skilled nursing home/convalescence hospital, Class C, in average condition, with interior sheetrock walls, an average floor height of 8-10', package heating and air conditioning units, and a wet sprinkler system. After classifying the building's components and discerning the associated base unit costs, Canterbury's expert applied a series of multipliers including current cost and local multipliers to discern a final cost, per square foot. After applying the multipliers, Canterbury's expert determined the replacement cost new for the building's 60,404 square feet, as of each valuation date.

Next, Canterbury's expert added the estimated costs for the building's two elevators, backup generator, and miscellaneous site improvements, including curbing, paving, sidewalks, and landscaping.

Finally, Canterbury's expert added an entrepreneurial profit of five percent (5%) to the replacement cost new of the building and site improvements.

Using the age-life depreciation method and assuming the "building has aged in a linear progression," Canterbury's expert estimated the effective age of the building. In Canterbury's expert's opinion, the building had effective ages ranging from 16 to 19 years, as of each valuation date. Canterbury's expert then applied deductions to the subject property's building for: (i) physical depreciation ranging from 40% to 47.5% (based on its changing effective age); and (ii) functional obsolescence of 10%. In addition, Canterbury's expert applied depreciation factors to the subject property's site improvements ranging from 40% to 60%.

   

In sum, Canterbury's expert concluded a depreciated replacement cost value for the subject property's building and site improvements of: (i) $6,283,343, as of the October 1, 2015 valuation date; (ii) $6,141,390, as of the October 1, 2016 valuation date; (iii) $5,835,246, as of the October 1, 2017 valuation date; (iv) $5,687,582, as of the October 1, 2018 valuation date; and (v) $6,382,008, as of the October 1, 2019 valuation date.

Finally, Canterbury's expert added his land value to his depreciated replacement cost of the subject property's building and site improvements and determined the subject property's true or market value as of each valuation date to be: (i) $8,800,000, as of the October 1, 2015 valuation date ($6,283,343 + $2,540,000 = $8,823,343); (ii) $8,700,000, as of the October 1, 2016 valuation date ($6,141,390 + $2,540,000 = $8,681,390); (iii) $8,400,000, as of the October 1, 2017 valuation date ($5,835,246 + $2,540,000 = $8,375,246); (iv) $8,200,000, as of the October 1, 2018 valuation date ($5,687,582 + $2,540,000 = $8,227,582); and (v) $8,900,000, as of the October 1, 2019 valuation date ($6,382,008 + $2,540,000 = $8,922,008).

b.    Cedar Grove's expert

In Cedar Grove's expert's opinion, the unit of comparison that is more appropriate for gauging the subject property's land value is the number of units/patient rooms in each facility because that is the common thread among all skilled care nursing facilities. In his opinion, consideration of a building's square footage and/or the square footage per unit/patient room is more relevant when analyzing independent living or assisted living facilities, where the facility is responsible for providing a "less medically intensive [form of] care" and daily assistance to its residents. In Cedar Grove's expert's opinion, skilled nursing care facilities address the needs of individuals recently discharged from hospitals/acute care medical facilities that require continuing medical care. Cedar Grove's expert expressed that despite assisted living facilities and skilled






nursing care facilities "both [being] in the same senior care market," and offering various forms of patient care, skilled nursing care facilities are "more hospital-like" and "provide 24/7 nursing care, specialized medical care, and/or daily therapy care." Thus, in Cedar Grove's opinion, they are constructed differently from independent living and assisted living facilities, where the focus is on communal living and communal use of facilities.

Because he was not permitted to enter occupied units/patient rooms, Cedar Grove's expert counted the floor tiles in the subject property's unoccupied units/patient rooms to estimate their approximate size. Cedar Grove's expert estimated that the subject property's semi-private rooms each contain approximately 416 square feet, and the private rooms each contain approximately 390 square feet. Thus, the units/patient rooms account for approximately 39,624 square feet of the building (84 units x 416 sq. ft. = 34,944 square feet + 12 units x 390 sq. ft. = 4,680 square feet). In Cedar Grove's expert's opinion, the subject property's units/patient rooms were average in size and not sub-standard for skilled nursing care facilities in New Jersey.

To determine the subject property's land value, Cedar Grove's expert identified six land sales with approvals in place to construct an assisted living and dementia/memory care facility. The six sale transactions took place between February 2014 and February 2019 and were in Morris County (1), Passaic County (2), Essex County (1), Union County (1), and Bergen County (1). As stated above, Cedar Grove's expert's comparative analysis focused on the number of units/patients rooms approved and the per unit value. According to Cedar Grove's expert, the unadjusted sale prices for the land sales ranged from $2,040,000 to $7,122,000, with approvals in place for between 79 and 177 units/patient rooms, reflecting a value of $20,400 to $68,333 per unit/patient room.

Cedar Grove's expert applied adjustments to the land sales to account for differences in location (-10% to 10%), lot size (-10% to -5%), topography (10%), number of units (-5% to 15%),

   

and approvals (-10%).

Cedar Grove's expert's location adjustments were determined after comparing the reported "median household income level" of Cedar Grove to that of the other municipalities, inferring that municipalities with a lower median household income level were inferior and municipalities with a higher median household income level were superior. After reviewing and comparing the reported median household income levels of Cedar Grove to his land sales, Cedar Grove's expert applied a +10% location adjustment to land sale 2 and a -10% location adjustment to land sale 3.

In addition, Cedar Grove's expert found that the lot sizes of land sales 1, 2, 3, 4, and 6 were substantially larger and thus superior to the subject property's lot size. Accordingly, Cedar Grove's expert applied lot size adjustments of -5% to land sales 1, 2, 4, and 6, and a lot size adjustment of -10% to land sale 3.

Cedar Grove's expert further explained that although the subject property's topography was level with the roadway and slopes downwards, in his opinion it was comparable to the topography of land sales 1, 3, 4, 5, and 6, and accordingly, no topography adjustment was warranted. However, with respect to land sale 2, he observed that it is "sloped steeply upward to the rear . . . [and] featured a heavily wooded and rocky terrain." Therefore, Cedar Grove's expert applied a +10% topography adjustment to land sale 2.

Cedar Grove's expert further expressed that due to economies of scale, an "inverse relationship between size and price" exists in the marketplace. Stated differently, a skilled nursing care facility possessing more units/patient rooms would be superior to the subject property, whereas a skilled nursing care facility possessing fewer units/patient rooms would be inferior to the subject property. Accordingly, Cedar Grove's expert applied a +10% unit/patient room adjustment to land sales 1, 3, and 4 (possessing between 120 to 153 units/patient rooms), a +15%






unit adjustment to land 6 (possessing 177 units/patient rooms), and a -5% unit adjustment to land sale 5 (possessing 79 units/patient rooms).

Additionally, Cedar Grove's expert applied a -10% adjustment to land sales 1, 2, 3, 4, 5, and 6 for the presence of development approvals. In Cedar Grove's expert's opinion, the land sales were superior because they were sold with approvals in place to construct an assisted living facility. However, in arriving at the subject property's land value, Cedar Grove's expert testified that he must assume that no approvals were in place except those expressly permitted under the zoning ordinances. Thus, because the subject property's site does not satisfy several current bulk requirements, variances would be required to permit the existing 96 units/patient rooms.

Finally, during cross-examination Cedar Grove's expert stated, "I feel that I should have done it here [added entrepreneurial profit to the land value], . . . I actually agree with your appraiser [Canterbury's expert] . . . I feel that the land, and the whole package, the whole development, should be viewed as one economic unit, entrepreneurial profit should not only apply to the improvements but to the land itself. . . ."

Cedar Grove's expert's adjusted land sales ranged from $21,420 to $54,666 per unit/patient room. Cedar Grove's expert expressed that the "mid-range" of the adjusted values, on a per unit/patient room, was $33,100. Therefore, Cedar Grove's expert concluded a land value for the subject property of $3,175,000 or $33,100 per unit/patient room ($33,100 x 96 units/patient rooms = $3,177,600), for all tax years at issue.

Like Canterbury's expert, Cedar Grove's expert employed the Cost Manual to generate a replacement cost new estimate for the subject property's building, elevators, and site improvements. Cedar Grove's expert used the CoreLogic Marshall and Swift Computerized Commercial Cost Estimator program to verify his Cost Manual calculations. Cedar Grove's expert






similarly categorized the subject property's building as a 60,404 square foot, brick exterior, skilled nursing home, Class C, under the cost Manual's Section 15 "Nursing Homes (Convalescent Hospitals)," in average condition. In addition, Cedar Grove's expert added the estimated costs of a wet sprinkler system to the Cost Manual's base cost.

However, in Cedar Grove's expert's opinion, approximately 9,725 square feet of the building's first floor is below grade-level and should be treated as a basement, under Section 15 of the Cost Manual, "Nursing Home (Convalescent Hospital) Basements." In his opinion, the building's remaining approximately 5,430 square feet of first floor is above-grade, or partially above-grade, and should be treated as grade-level. Thus, Cedar Grove's expert attributed a different base cost under the Cost Manual to the approximately 9,725 square feet of the building's first floor basement area than he did to the approximately 5,430 square feet of the building's first floor grade-level area. In addition, because he found that the first floor of the building was not heated and cooled with "Package A/C," Cedar Grove's expert deducted from the Cost Manual's base cost the estimated cost for "Package A/C" and added the Cost Manual's cost for hot water baseboard heat and air conditioning.

In addition, in computing the replacement cost new for the approximately 45,249 square feet of second, third, and fourth floor areas, Cedar Grove's expert similarly deducted from the Cost Manual's base cost the estimated cost for "Package A/C" and added the costs of individual heat pumps (finding that the second, third, and fourth floor units/patient rooms and patient lounges/day rooms were heated and cooled by individual heat pumps).

In addition, Cedar Grove's expert applied a perimeter multiplier to the subject property's approximately 45,249 square feet of second, third, and fourth floors. Moreover, in Cedar Grove's expert's opinion, the subject property's second, third, and fourth floors have an average story






height of between ten to twelve feet, resulting in application of the Cost Manual's height multiplier. Accordingly, Cedar Grove's expert applied the Cost Manual's height multiplier to his calculated base costs for the subject property's second, third, and fourth floors.

Next, Cedar Grove's expert added the estimated costs for the building's elevators, standby generator, and site improvements. Cedar Grove's expert then applied current cost and local cost multipliers to his adjusted base costs, and the estimated costs for the elevators, standby generator, and site improvements.

Finally, Cedar Grove's expert applied an entrepreneurial profit factor of ten percent (10%) to the replacement cost new of the building and site improvements.

Using the Cost Manual's depreciation tables and estimating that the subject property has an effective age of twenty years, Cedar Grove's expert applied a thirty percent (30%) depreciation deduction. In addition, because the building's standby generator does not service the entire building, Cedar Grove's expert applied a five percent (5%) functional obsolescence deduction.

In sum, Cedar Grove's expert concluded a depreciated replacement cost new value for the subject property's building, elevator, standby generator, and site improvements of: (i) $8,956,500, as of the October 1, 2015 valuation date; (ii) $9,235,200, as of the October 1, 2016 valuation date; (iii) $9,263,300, as of the October 1, 2017 valuation date; (iv) $9,578,700, as of the October 1, 2018 valuation date; and (v) $9,640,700, as of the October 1, 2019 valuation date.

Cedar Grove's expert then added his land value to his depreciated replacement cost new of the subject property's building and site improvements, to determine the subject property's true or market value as of each valuation date of: (i) $12,130,000, as of the October 1, 2015 valuation date ($8,956,500 + $3,175,000 = $12,131,500); (ii) $12,410,000, as of the October 1, 2016 valuation date ($9,235,200 + $3,175,000 = $12,410,200); (iii) $12,440,000, as of the October 1, 2017






valuation date ($9,263,300 + $3,175,000 = $12,438,300); (iv) $12,755,000, as of the October 1, 2018 valuation date ($9,578,700 + $3,175,000 = $12,753,700); and (v) $12,815,000, as of the October 1, 2019 valuation date ($9,640,700 + $3,175,000 = $12,815,700).

    c.    Court's analysis

Pivotal to appreciating the experts' analysis and conclusions in these matters is an understanding of the different types and characteristics of housing available in the senior living care field. In general, four types of senior living care facilities exist: (i) independent living facilities;[12] (ii) assisted living/memory care facilities ("ALMC"); (iii) skilled care nursing facilities; and (iv) continuing care retirement communities or CCRC's.[13] Here, the court's focus is on ALMC facilities and skilled care nursing facilities, as these are the facility types that were employed by the experts to compare and contrast their land sales.

ALMC facilities are licensed and regulated by the State of New Jersey under a certificate of need program. See N.J.S.A. 26:2H-1 to -26, the Health Care Facilities Planning Act (the

---

[12] Independent living facilities are "age-restricted multifamily properties with central dining facilities that provide residents with access to meals and other services such as housekeeping, linen service, transportation, and social and recreational activities." Appraisal Institute, The Appraisal of Nursing Facilities, 14 (2009). Independent living facilities are tailored to individuals that can live independently and "without significant healthcare support . . . offer[ing] . . . a package of housekeeping, security, meals, and social services." Ibid. These facilities provide apartment-style living arrangements "plus an array of public areas . . . includ[ing] dining, social, and activity spaces . . . educational areas such as expanded libraries with computers, multi-purpose auditoriums, that can function as lecture halls, live performance centers, or theaters, and fitness centers with indoor pools and exercise equipment." Ibid.

[13] Continuing care retirement communities are generally situated on a large campus or area and include a combination of senior care living arrangements including independent living facilities, assisted living/memory care facilities, and/or skilled nursing care facilities. Id. at 17. In general, these facilities are vast but permit individuals to transition from an independent living arrangement to a supervised living arrangement that is tailored to meet the individual's needs as they age. Often, continuing care retirement communities include payment of an up-front entry fee with a reduced monthly service fee during the occupancy period.






"HCFPA"); N.J.A.C. 8:33-1.1 to -7; N.J.A.C. 8:36-1 to -21. The HCFPA defines "[a]ssisted living" as "a coordinated array of supported personal and health services, available 24 hours per day, which promote resident self-direction and participation in decisions that emphasize independence, individuality, privacy, dignity, and homelike surroundings to residents who have been assessed to need these services, including residents who require formal long-term care." N.J.S.A. 26:2H-7.15. Moreover, an "[a]ssisted living residence" is designed "to provide apartment-style housing and congregate dining and to assure that assisted living services are available when needed, . . . [a]partment units shall offer, at a minimum, one unfurnished room, a private bathroom, a kitchenette, and a lockable door on the unit entrance." N.J.A.C. 26:2H-7.15. Thus, an ALMC facility is designed to "offer[] a suitable living arrangement for persons with a range of capabilities, disabilities, frailties, and strengths . . . however, assisted living is not appropriate for individuals who are incapable of responding to their environment, expressing volition, interacting, or demonstrating any independent activity." N.J.A.C. 8:36-1.2(c).

Moreover, in 2016, our Legislature enacted the Dementia Care Home Act, N.J.S.A. 26:2H-148 to -157 (the "DCHA"). The DCHA defined residents of a memory care facility or "dementia care home" as adults "with Alzheimer's disease and related disorders or other forms of dementia," who also are "ambulant with or without assistive devices"; have been "certified by a licensed physician . . . not in need of skilled nursing care"; and "except in the case of a person 65 years of age or over, [are] in need of dietary services, supervision of self-administration of medications, supervision of and assistance in activities of daily living, or assistance in obtaining health care services." N.J.S.A. 26:2H-150(b) (emphasis added). The DCHA provides that a resident of a memory care facility "shall not be given skilled nursing care while a resident" except in cases of "emergencies or during temporary illness for a period of one week or less." Ibid. (emphasis added).






Thus, ALMC facilities share "many [of the same] design and construction features with independent living facilities." Appraisal Institute, The Appraisal of Nursing Facilities, 14 (2009). However, ALMC facility units "are typically smaller . . . because the resident requires more personal care services, designs include more accessibility features," including bathrooms with larger shower areas or low entry thresholds to achieve greater access. Ibid. For example, an ALMC facility will typically have shorter corridor lengths than independent living facilities to accommodate residents that are less mobile. Ibid. Moreover, "[c]ommon and support areas are similar to independent living facilities but not usually on the same scale since assisted living facilities tend to have fewer living units." Ibid.

A skilled nursing care facility is also licensed and regulated by the State of New Jersey under a certificate of need program. See N.J.S.A. 26:2H-1 to -26; N.J.S.A. 26:2H-47 to -52; N.J.A.C. 8:33H. However, unlike an ALMC, a skilled nursing care facility "provide[s] various levels of health care service on a 24-hour basis in addition to shelter, dietary, housekeeping, laundry, social needs." The Appraisal of Nursing Facilities, at 16 (emphasis added). A "skilled nursing facility" is generally defined as "a free-standing institution or an identifiable part of an institution which meets all the State and Federal requirements for participation in the Medicare Program as a skilled nursing facility." N.J.A.C. 8:85-1.2.

Under the federal Medicare Program, skilled nursing care services are defined as:

> (1) ordered by a physician; (2) [r]equir[ing] the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists; and (3) [a]re furnished directly by, or under the supervision of, such personnel.
>
> [42 C.F.R. § 409.31(a).]

In addition, the facility must furnish a level of care that the patient requires from "skilled






nursing or skilled rehabilitation services, or both, on a daily basis" and "the daily skilled services must be ones that, as a practical matter, can only be provided in a [skilled nursing care facility], on an inpatient basis." 42 C.F.R. § 409.31(b).

In New Jersey, skilled nursing care facilities are charged with providing "health care under medical supervision and continuous nursing care for 24 or more consecutive hours to two or more patients who do not require the degree of care and treatment which a hospital provides and who, because of their physical or mental condition require continuous nursing care and services above the level of room and board." N.J.A.C. 8:33H-1.2 (emphasis added). In sum, skilled nursing care facilities offer a "level of nursing and supportive care provided by licensed nurses to patients who need 24-hour nursing services on an extended basis." The Appraisal of Nursing Facilities, at 16.

Because of the distinctions and differences in the services being rendered, "[t]he physical layout of [skilled] nursing facilities differs from other elderly housing in that most patient rooms are semi-private with restrooms often shared between rooms; bathing facilities are communal; corridors and doorways are wider; and nurses' stations are positioned to view down all patient corridors." Ibid. (emphasis added).

It is against this backdrop that the court considers, reviews, and analyzes the experts' land sale data, deductions for functional obsolescence, and the conclusions derived therefrom.

1.    Land sales

At the outset, the court emphasizes that Canterbury's expert concluded a land value of $2,416,160 (exclusive of entrepreneurial profit), translating into $25,168 per unit/patient room or $24.96 per square foot of land. Cedar Grove's expert concluded a land value of $3,175,000, translating into $33,100 per unit/patient room, or $31.20 per square foot of land. Thus, although the experts employed different units of comparison in identifying, comparing, and analyzing their






respective land sales, their concluded unit/patient room values are not altogether disparate.

The court further highlights that of the fifteen land sales identified by the experts, only one was approved for use as a skilled nursing care facility. The remaining fourteen land sales were either ALMC facilities or a combination of independent living/ALMC facilities. The experts attributed the lack of skilled nursing care facility land sales to the evolving and changing landscape of the senior housing facility field. Although the experts did not agree that ALMC facilities and skilled nursing care facilities would be constructed in an identical manner, the experts agreed that, for purposes of land valuation, the use of a property as an ALMC and as a skilled nursing care facility are substantially similar.

According to Canterbury's expert, the stagnation in the construction of new skilled nursing care facilities coincided with changes implemented under the Medicaid payment system in 2014, shifting away from a direct payment arrangement to a managed care model. Because of these changes, Canterbury's expert opined that patient care has shifted to facilities that more closely resemble an ALMC model and away from more costly skilled nursing care, resulting in declining occupancy rates in skilled nursing care facilities. As such, he concluded that recent development trends have fostered the construction of more independent living and ALMC facilities and less skilled nursing care facilities.

The court has no reason to question the validity of the experts' testimony that recent trends in the senior housing facility industry have focused more on the construction and development of independent living and ALMC facilities. Moreover, the court accepts as reasonable and credible the testimony of Canterbury's expert that ALMC facilities offer greater common area space, design features, amenities, and common elements that are aimed at improving the quality-of-life of their residents. Further, the court recognizes that both skilled nursing care facilities and ALMC facilities






are subject to certificate of need and regulatory oversight by the State.

However, the court departs with Canterbury's expert's conclusion that patient care has shifted to ALMC facilities and away from skilled nursing care facilities. Although the court acknowledges that there is an overlap of services rendered in both ALMC and skilled nursing care facilities (shelter, dietary, housekeeping, laundry, etc.), only a skilled nursing care facility is permitted under law and equipped to provide medical, vocational, and physical therapy to its patients. The court finds more credible Cedar Grove's expert's testimony that the type of care provided at a skilled nursing care facility is specifically tailored and equipped to meet the needs of patients requiring sub-acute medical care. Conversely, ALMC facilities are aimed at providing assisted apartment-style living without continuous medical care. Thus, the selection of a senior housing facility is likely dictated by the patients' daily medical and health care needs.

In addition, a skilled nursing care facility has requirements not found in ALMC facilities. The medical, vocational, and therapeutic services must be: (i) rendered to in-patients at skilled nursing care facilities; (ii) ordered by a physician; and (iii) provided by individuals possessing specific licensure, including "registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists." 42 C.F.R. § 409.31(a). These types of technical services are not afforded patients in ALMC facilities.

Thus, skilled nursing care facilities are charged with furnishing medical and health care services to their patients on a 24-hour basis. In sharp contrast, residents in ALMC facilities "<u>shall not be given skilled nursing care</u>" except in cases of "emergencies or during temporary illness for a period of one week or less." N.J.S.A. 26:2H-150(b) (emphasis added). Accordingly, because of the medical needs, supervision, and oversight required for patients in skilled nursing care facilities, "[t]he physical layout of [skilled] nursing facilities differs from other elderly housing in that most






patient rooms are semi-private with restrooms often shared between rooms; bathing facilities are communal; corridors and doorways are wider; and nurses' stations are positioned to view down all patient corridors." The Appraisal of Nursing Facilities at 16.

Accordingly, the court does not find that the gross building area/per unit, and gross building area/per bed units of comparison employed by Canterbury's expert represent the most accurate units of comparison for a skilled nursing care facility. That is not to say that the gross building area/per unit and gross building area/per bed units of comparison cannot be employed when attempting to compare and contrast ALMC facilities. However, due to the disparities in the services provided, and differences in how skilled nursing care facilities are constructed to best furnish those services to its patients, the court finds that the gross building area/per unit and gross building area/per bed units of comparison are not the most accurate measurement of a skilled nursing care facility's land value.[14]

Rather, the court finds Cedar Grove's expert's methodology and testimony that, a more appropriate unit of comparison and gauge of the subject property's land value is the number of units/patient rooms that are approved for construction on a property, to be more credible because it reflects the common denominator among all skilled care nursing facilities. Here, because both

---

[14] The court acknowledges that Canterbury's expert's review and analysis of market data evinces that the gross building area to patient bed ratio in skilled nursing care facilities is 724 square feet and that the subject property's gross building area to patient bed ratio is 336 square feet. However, the court finds this is more telling evidence of the subject property's functional obsolescence than as a reliable indicator of its land value. Moreover, the stagnation and lack of construction of new skilled nursing care facilities in New Jersey may be more accurately characterized as an element of economic or external obsolescence rather than as a factor defining or distinguishing the comparable land sales. Canterbury's expert's appraisal report states that the subject property "suffers from depreciation in the form of external (economic) obsolescence resulting in income/rental loss. However, this [is] offset[] by the strong occupancy at the subject property. Therefore, no adjustment for external obsolescence was made."






Canterbury's expert and Cedar Grove's expert furnished the court with information on the land sales price per unit/patient room, the court possesses the data necessary for such analysis.

Canterbury's expert's land sales can be separated into two categories: (i) land sales situated in Bergen, Essex, and Union Counties (land sales 3, 5, 8, and 9), located between 5 to 17 miles of the subject property; and (ii) land sales situated in Mercer, Middlesex, and Monmouth Counties (land sales 1, 2, 4, 6, and 7), located between 41 to 64 miles from the subject property. The court's analysis of the two categories of land sale data demonstrates that under the Bergen, Essex, and Union County land sales, the price range was $21,250 to $33,125 per unit/patient room, with a mean of $27,591 and median of $27,994. Comparatively, under the Mercer, Middlesex, and Monmouth County land sales, the price range was $10,333 to $37,059 per unit/patient room, with a mean of $18,924 and median of $15,859. Despite this glaring difference, in Canterbury's expert's opinion, no location adjustment was warranted to the Mercer, Middlesex, and Monmouth County land sales because he viewed them as being similar in location to the subject property

The court emphasizes that "[e]vidence of comparable sales is effective in determining [the] value of property for property tax purposes only where there is substantial similarity between the properties" and the subject property. Kearny Leasing Corp. v. Town of Kearny, 6 N.J. Tax 363, 376 (Tax 1984). However, comparability is vitiated when there are material location differences between the land sales and the subject property. See Venino v. Borough of Carlstadt, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b. 4 N.J. Tax 528 (Tax 1981) ("Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties so as to admit of reasonable comparison.")

Here, the court finds Canterbury's expert's testimony that no location adjustment was warranted to the Mercer, Middlesex, and Monmouth County land sales to be unreliable and not






credible. These five sales evinced a difference in mean sale price of $8,667 per unit/patient room and median sale price of $12,135 per unit/patient room. Despite these differences, Canterbury's expert concluded that no location adjustment was warranted. The court finds such failure to apply a location adjustment to the five Mercer, Middlesex, and Monmouth County land sales vitiates their meaningfulness and usefulness in attempting to discern the subject property's land value. However, the court finds that Canterbury's expert's land sales 3, 5, 8, and 9 present credible evidence of the subject property's value.

Additionally, Canterbury's expert offered credible rebuttal testimony disclosing that Cedar Grove's expert's land sale 1 and land sale 6 were sold with development approvals in place to construct independent living/ALMC facilities. The evidence disclosed that Cedar Grove's expert's land sale 1 was sold with development approvals to construct a 136 unit and 176 bed combined independent living/ALMC facility. The rebuttal evidence further disclosed that Cedar Grove's expert's land sale 6 was sold with development approvals to construct a 178 unit and 233 bed combined independent living/ALMC facility. The court finds that these material differences in the approvals and intended uses of Cedar Grove's expert's land sale 1 and land sale 6 renders them of dubious usefulness in discerning the subject property's land value.

Moreover, during trial Canterbury's expert offered meaningful rebuttal testimony that Cedar Grove's expert's land sale 2 comprised 91 units/patient rooms and not the 100 units/patient rooms reported by Cedar Grove's expert. Thus, the unadjusted sale price for Cedar Grove's expert's land sale 2 should have been $22,418 per unit/patient room ($2,040,000/91 = $22,418) and the adjusted sale price should have been $23,539 per unit/patient room.

In addition, during trial the evidence disclosed that Cedar Grove's expert's land sale 3 was sold with approvals to construct a 180,402 square foot building, not the 62,152 square foot building






initially reported by Cedar Grove's expert. More importantly, Canterbury's expert offered rebuttal testimony that discussions with the buyer's representative revealed that they purchased the subject property with the intent of future development, as the site comprised 8.79 acres of land, more than necessary to construct their facility. Thus, without an analysis of the potential contributory value of the additional vacant land, the court finds that Cedar Grove's expert's land sale 3 is of dubious usefulness in discerning the subject property's land value.

Accordingly, for the foregoing reasons the court strikes Cedar Grove's expert's land sales 1, 3, and 6 from consideration in determining the subject property's land value. However, the court finds Cedar Grove's expert's land sales 2, 4, and 5, including the adjustments applied thereon, to be reasonable and credible evidence of the subject property's land value.

Therefore, the court's review and analysis of Canterbury's expert's land sales 3, 5, 8, and 9, and Cedar Grove's expert's land sales 2, 4, and 5, discloses a sales price range of $21,250 to $37,120 per unit/patient room, with a mean of $27,625 per unit/patient room.[15] Affording each land sale equal weight, the court finds that the evidence supports a value of $28,000 per unit/patient room for the subject property, or $2,690,000 ($28,000 x 96 = $2,688,000).

Finally, despite the experts' testimony that an entrepreneurial profit should be applied to the vacant land value component under the cost approach, this methodology has been considered and rejected by this court.

In Sears Roebuck & Co. v. Rockaway Twp., 12 N.J. Tax 381 (Tax 1992), the taxpayer challenged the local property tax assessment on a two-story, 188,576 square foot department store located on 15-acres of land. Employing the cost approach, the taxing district's valuation expert

---

[15]  $30,380 + $25,608 + $33,125 + $21,250 + $23,539 + $22,353 + $37,120 = $193,375/7 = $27,625.






determined a value for the land and for the replacement cost new of the property's improvements. The expert then applied a 10% entrepreneurial profit to the combined value of the land and the improvements replacement cost new. The court found credible the taxing district's expert's reproduction cost and land value estimates. However, Judge Lasser squarely rejected the expert's application of entrepreneurial profit to the land value, stating that, "where land is valued at the market by the use of comparable land sales, the market has already reflected entrepreneurial profit in the land value and the [entrepreneurial] factor should only be applied to the improvements cost."

The court finds that the reasoning expressed thirty years ago by Judge Lasser in rejecting application of an entrepreneurial profit factor to the land value remains sound. The court finds that the market, through a comprehensive examination of land sales and application of adjustments to those land sales, will more accurately dictate the costs and associated profit a developer anticipates in a transaction. Accordingly, the court declines to apply an entrepreneurial factor to the land sales.

Therefore, the court finds that the subject property's land value, as of the October 1, 2015, October 1, 2016, October 1, 2017, October 1, 2018, and October 1, 2019 valuation dates is $2,690,000.

2.    Replacement Cost New

Although Canterbury asserts that "the parties disagreed on virtually all aspects of the cost approach procedure," the court finds such position mischaracterizes the experts' testimony and fails to recognize certain basic and fundamental understandings applied by the experts in undertaking their respective replacement cost approaches.

For example, both experts agreed that: (i) the building is a 60,404 square foot brick exterior skilled nursing home; (ii) the nursing home is 100% serviced with a wet sprinkler system; and (iii)






the building should be characterized under the Cost Manual as Class C in average condition. Moreover, both experts applied the Cost Manual, Section 15, "Nursing Homes (Convalescent Hospitals)," identical base replacement costs for approximately 50,679 square feet of the building (45,249 + 5,430 = 50,679 square feet) as follows: (i) $134.77 p.s.f. for the 2016 tax year; (ii) $139.62 p.s.f. for the 2017 and 2018 tax years; and (iii) $144.00 p.s.f. for the 2019 and 2020 tax years. In addition, the experts agreed that the replacement cost for the wet sprinklers on approximately 45,249 square feet of the building (comprising the second, third, and fourth floors) was: (i) $2.75 p.s.f. for the 2016 tax year; (ii) $2.84 p.s.f. for the 2017 and 2018 tax years; and (iii) $2.93 p.s.f. for the 2019 and 2020 tax years. The experts further agreed that a current cost multiplier and local cost multiplier should be applied to the base replacement costs as follows: (i) 1.07 & 1.27 for the 2016 tax year; (ii) 1.04 & 1.30 for the 2017 tax year; (iii) 1.06 & 1.28 for the 2018 tax year; (iv) 1.07 & 1.27 for the 2019 tax year; and (v) 1.07 & 1.28 for the 2020 tax year. Finally, for purposes of computing the appropriate depreciation factor, the experts agreed that the typical life expectancy of a skilled nursing care facility is forty (40) years.

The experts departed in their replacement cost approaches in the following key areas: (i) the replacement cost of the approximate 9,700 square feet of the building's first floor below-grade area; [16] (ii) whether and how to make adjustments to the base costs under the Cost Manual for its

---

[16] The experts' opined that the building contains 60,404 square feet, or 15,101 square feet per floor (60,404/4 = 15,101). However, Cedar Grove's estimate of 5,430 square feet of first floor above-grade area and 9,725 square feet of first floor below-grade area equates to 15,155 square feet (5,430 + 9,725 = 15,155). In addition, Cedar Grove's expert's allocation of 45,249 square feet to the building's second, third, and fourth floors does not equal 15,101 square feet per floor (15,101 x 3 = 45,303). Accordingly, for purposes herein, the court will adjust the first-floor measurement as comprising 5,401 square feet of grade-level area and 9,700 square feet of below-grade area. In addition, the court will adjust the measurements for the second, third, and fourth floors as comprising 45,303 square feet (15,101 x 3 = 45,303).






included "Package A/C" and the building's hot water baseboard heat, air conditioning, heat pumps, and the wet sprinkler system; (iii) whether a perimeter and height multiplier should be applied to the approximate 45,303 square feet of the building's second, third, and fourth floors; (iv) the replacement cost of the subject property's two elevators, site improvements, and backup generator; (v) whether deductions should be applied to the replacement cost to account for functional obsolescence and depreciation; and (vi) the entrepreneurial profit factor to be applied to the building and site improvements.  The court will sequentially address each of these differences.

      a.     Below ground level space

The cost approach "involves a replication, through the use of widely accepted cost services . . . of the cost of the components of the building to be valued, less . . . depreciation[s]."  Gale & Kitson Fredon Golf, LLC v. Fredon Twp., 26 N.J. Tax 268, 283 (Tax 2011) (quoting 43 New Jersey Practice, State and Local Taxation, 7.3, at 113 (David Crabtree)(1st ed. 2007)).  Thus, the cost approach attempts to determine the cost of replacing the building and improvements as they were constructed, despite its perceived functional obsolescence.

A basement is defined as the "lowest story of a building, which may be partially or wholly below ground level."  Appraisal Institute, The Dictionary of Real Estate Appraisal, 367 (5th ed. 2010).  In addition, the Cost Manual specifically instructs appraisers that "[b]asements should be computed separately from the upper floors and are subject to their own modifiers and multipliers. . . ."

Here, the photographs and the experts' undisputed testimony demonstrates that certain areas of the building's first floor are above grade-level or partially above grade-level (the lobby, physical therapy facilities, conference room, ground floor dining/meeting room, and administrative/nursing director's office).  However, due to downward sloping grade of the lot,






other areas of the building's first floor are entirely or principally below grade-level (the employee lounge, kitchen, laundry facilities, records storage room, storage area, and mechanical room/generator).

Therefore, approximately 5,401 square feet of the building's first floor is at, or partially above, grade-level and approximately 9,700 square feet of building's first floor is below grade-level. Thus, the court finds Cedar Grove's expert's approach to calculating the replacement cost of the building's first floor to be more credible and representative of the Cost Manual's instructions. Canterbury's expert's approach to calculating the replacement cost new of the building's first floor does not accurately account for the fact that approximately 9,700 square feet of the building's first floor is below grade-level. Accordingly, the court concludes that Cedar Grove's expert's methodology for developing the replacement cost for the building's approximate 15,101 square feet of first floor area best achieves those goals.

b.    Adjustments for heating and cooling systems and wet sprinklers

The experts offered conflicting testimony during trial with respect to the composition and design of the building's heating and cooling systems. As a result, the experts fashioned their calculations of the base cost and adjusted base costs of the building differently. Cedar Grove's expert segregated the building into three distinct sections, making deductions from and additions to the Cost Manual's base costs according to how each area of the building was heated and cooled. Conversely, Canterbury's expert viewed the building as one unit, applying the Cost Manual's base cost each year to the building's entire square footage.

After considering the experts' testimony and carefully reviewing the photographs contained within each appraisal report, the court finds that: (i) the perimeter areas of the first floor of the building (lobby, physical therapy area, conference room, administrative office, dining






room/meeting room, employee lounge/restrooms) are heated with baseboard heating and cooled with a forced air system; (ii) the core or central areas of the first floor (hallways, elevator area, kitchen) are heated and cooled with package heating/air conditioning systems; (iii) the perimeter of the second, third, and fourth floors (the units/patient rooms and patient lounges/day rooms) are heated and cooled with in-room heat pumps; and (iv) the core or central areas of the second, third, and fourth floors (the nursing stations, corridors/hallways, common bath facilities) are heated and cooled with package heating/air conditioning systems.[17]

Accordingly, the court finds Cedar Grove's expert's methodology more credible, and thus, that it more accurately resembles how the replacement cost new of the building should be calculated. However, the court finds that Cedar Grove's expert's calculations must be further refined to account for differences in how the building's second, third, and fourth floors are heated and cooled, and to account for increased costs associated with the building's fourth floor (discussed later herein). Because aspects of the building's second, third, and fourth floor areas are heated and cooled differently, the court concludes that the building's second, third, and fourth floor, collectively comprising approximately 45,303 square feet, must be further dissected into two segments: (i) approximately 39,624 square feet comprising the units/patient rooms and patient lounges/day rooms;[18] and (ii) approximately 5,679 square feet comprising the building's core areas

---

[17] Cedar Grove's expert testified that he only recalled seeing air diffusers in the fourth floor nursing station area. However, the court's review of the photographs discloses the presence of air diffusers in the third floor and fourth floor nursing station areas, and second-floor hallway.

[18] According to the experts, the subject property comprises 84 semi-private units/patient rooms and 12 private units/patient rooms. Cedar Grove's expert credibly testified that the semi-private units/patient rooms averaged approximately 416 square feet, or approximately 34,944 square feet (84 units x 416 sq. ft. = 34,944 square feet), and that the private units/patient rooms averaged 390 square feet, or approximately 4,680 square feet (12 units x 390 sq. ft. = 4,680 square feet) (34,944 sq. ft. + 4,680 sq. ft. = 39,624 square feet).






including the nursing stations, hallways, and common showers.[19]

As highlighted by Cedar Grove's expert, the Cost Manual states that for Class C "Nursing Homes (Convalescent Hospitals)" in average condition, the base replacement cost includes "Package A/C." Because he is charged with computing the replacement cost new of the building as it was constructed, and because the building was not constructed with "Package A/C," Cedar Grove's expert deducted the Cost Manual's contributory value of "Package A/C" and added the costs for hot water baseboard heat, air conditioning, and heat pumps in determining his adjusted base cost. Notably however, the experts' testimony and photographic evidence confirms that the perimeter of the second, third, and fourth floors are occupied by units/patient rooms that are heated and cooled with individual heat pumps (comprising approximately 39,624 square feet). Therefore, approximately 5,679 square feet of the building's core areas on the second, third, and fourth floors (the nursing stations, hallways, common showers) are heated and cooled with a "Package A/C" system.

In addition, the Cost Manual states that for Class C "Nursing Home (Convalescent Hospital) Basements," the base replacement cost includes "Forced Air," not "Package A/C." Thus, Cedar Grove's expert's deduction of the contributory value of "Package A/C" from the approximately 9,700 square feet of "Nursing Home (Convalescent Hospital) Basement" base cost was incorrect. Instead, a deduction should have been made for the contributory value of a "Forced Air" system.

Finally, the court concludes that the methodology employed by Canterbury's expert in

---

[19] Because no testimony was offered by either Cedar Grove's expert regarding the square footage of the core or central areas of the building's first floor also heated by forced air, the court was unable to further dissect his base costs for the building's first floor.






calculating the replacement cost for the building's wet sprinkler system is more accurate and should be employed. The Cost Manual states that "[t]he square foot costs listed are based on the <u>total area of sprinkler system installation</u> on a single main connection including its prorated share of contractors' overhead and profit and architects' fees" (emphasis added). Cedar Grove's expert attributed three separate and distinct costs to the building's wet sprinkler system based solely on the square footage of the area for heating and cooling purposes. However, during cross-examination Cedar Grove's expert admitted that the building's wet sprinkler system is composed of a single main and standpipe. Moreover, the Cost Manual does not state that the cost for a wet sprinkler in a basement should be viewed differently than the cost for the wet sprinkler system throughout the balance of the building. Thus, the court finds that, as the Cost Manual recites, the cost for a wet sprinkler system must be "based on the total area of sprinkler system." Here, the wet sprinkler system covered the entire 60,404 square feet of the building. Accordingly, the court finds that Canterbury's expert's application of one replacement cost to the building's 60,404 square feet is more accurate.

Thus, the adjusted base cost calculations should be as follows:

| | **2016 Tax Year** | | | |
| | Section 1 (1st Floor) 5,401 sq. ft. | Section 2 (Basement) 9,700 sq. ft. | Section 3 (Units/patient rooms) 39,624 sq. ft. | Section 4 (2nd, 3rd & 4th Floor core areas) 5,679 sq. ft. |
|---|---|---|---|---|
| Base Cost New | $134.77 | $81.43 | $134.77 | $134.77 |
| Less: Package A.C. | -$18.10 | -$12.75 | -$18.10 | $0.00 |
| Plus: HWBB | +$19.65 | +$19.65 | $0.00 | $0.00 |
| Plus: A/C | +$5.39 | +$5.39 | $0.00 | $0.00 |
| Plus: Heat pumps | $0.00 | $0.00 | +$8.57 | $0.00 |
| Plus: Wet sprinkler | +$2.75 | +$2.75 | +$2.75 | +$2.75 |
| **Adj. Base Cost** | **$144.46** | **$96.47** | **$127.99** | **$137.52** |






| 2017 & 2018 Tax Years | | | | |
|---|---|---|---|---|
| | Section 1 (1st Floor) 5,401 sq. ft. | Section 2 (Basement) 9,700 sq. ft. | Section 3 (Units/patient rooms) 39,624 sq. ft. | Section 4 (2nd, 3rd & 4th Floor core areas) 5,679 sq. ft. |
| Base Cost New | $139.62 | $83.96 | $139.62 | $139.62 |
| Less: Package A.C. | -$18.60 | -$13.10 | -$18.60 | $0.00 |
| Plus: HWBB | +$20.20 | +$20.20 | $0.00 | $0.00 |
| Plus: A/C | +$5.55 | +$5.55 | $0.00 | $0.00 |
| Plus: Heat pumps | $0.00 | $0.00 | +$8.83 | $0.00 |
| Plus: Wet sprinkler | +$2.84 | +$2.84 | +$2.84 | +$2.84 |
| **Adj. Base Cost** | **$149.61** | **$99.45** | **$132.69** | **$142.46** |

| 2019 & 2020 Tax Years | | | | |
|---|---|---|---|---|
| | Section One (1st Floor) 5,401 sq. ft. | Section Two (Basement) 9,700 sq. ft. | Section Three (Units/patient rooms) 39,624 sq. ft. | Section Four (2nd, 3rd & 4th Floor core areas) 5,679 sq. ft. |
| Base Cost New | $144.00 | $86.50 | $144.00 | $144.00 |
| Less: Package A.C. | -$19.15 | -$13.55 | -$19.15 | $0.00 |
| Plus: HWBB | +$20.80 | +$20.80 | $0.00 | $0.00 |
| Plus: A/C | +$5.72 | +$5.72 | $0.00 | $0.00 |
| Plus: Heat pumps | $0.00 | $0.00 | +$9.08 | $0.00 |
| Plus: Wet sprinkler | +$2.93 | +$2.93 | +$2.93 | +$2.93 |
| **Adj. Base Cost** | **$154.30** | **$102.40** | **$136.86** | **$146.93** |

c. Perimeter and height multipliers

1. Perimeter multiplier

The Cost Manual's "base costs are based on a certain size and shape relationship, story height, heating, and number of stories, adjustments and refinements must be made for the subject property." CoreLogic's Marshall & Swift Commercial Building Cost Data, Best Practices (April 2018). Moreover, the Cost Manual instructions recite that the use of a perimeter multiplier is intended to account for the "variation in size and shape of a building has on the square foot . . . due to the variation in the proposition of exterior wall area to floor area." In effect, the perimeter multiplier is intended to account for the cost difference associated with constructing irregularly shaped buildings and accounting for differences in the size and shape of a building's floors.

During trial, Cedar Grove's expert testified that the building is rectangular, each floor






measures approximately 15,101 square feet, and that he measured the building's perimeter for this assignment, and during a prior appraisal assignment, comparing his measurements to the property record card.[20]  In Cedar Grove's expert's opinion, although the four-story building is constructed as a rectangle and all four floors possess the same square footage, a perimeter multiplier should be applied to the building's second, third, and fourth floors because the building's first floor is partially above-grade and partially below grade.  Therefore, Cedar Grove's expert applied a .975 perimeter multiplier, thereby reducing the base cost of the building's second, third, and fourth floors.

Conversely, finding that the building is constructed as a rectangle and each floor is comprised of the same square footage, Canterbury's expert applied no perimeter multiplier to the building in undertaking his cost approach.

The court recognizes that the Cost Manual attempts to account for the cost differences incurred in constructing a building due to variations in its size, shape, and floor area by permitting the user to apply a perimeter multiplier.  However, the undisputed testimony here is that the subject property's building is a rectangle and that each of the building's four stories possess the same gross size, shape, and floor area as the story below it.  Thus, there are no variations in the size, shape, and floor area of each of the building's four stories.  Accordingly, the court questions the accuracy of Cedar Grove's expert's limited application of the perimeter multiplier only to the building's second, third, and fourth floors.  If, pursuant to the Cost Manual's instructions, the perimeter multiplier is intended to account for the "variation in size and shape of a building has on the square

---

[20]  Cedar Grove's expert did not state what his building perimeter measurements were.  However, during trial he acknowledged that the property record card's measurements were similar, but not identical, to his measurements.  The court's review of the property record card discloses that the building has a linear perimeter measurement of approximately 748 square feet.






foot . . . due to the variation in the proposition of exterior wall area to floor area," and the building is a rectangle, then the perimeter multiplier should seemingly be applied to all four stories, not solely the second, third, and fourth floors.

Accordingly, the court finds Canterbury's expert's methodology here more credible, that a perimeter multiplier should not be applied.

### 2. Height multiplier

The instructions to the Cost Manual state, "[t]o effectively use the costs given in the Calculator Section of this manual, it is necessary to determine the average height of each story. This is easily accomplished by measuring the total height of the building and dividing by the number of stories" (emphasis added). The Cost Manual further explains that "[s]tory height is measured from the bottom of one floor or ceiling to the bottom of the next floor, disregarding mezzanines. . . ." Moreover, the Cost Manual instructs the user to "[m]ultiply base cost by . . . multipliers for any variation in average story height from the base of 12 feet." (emphasis added).

Here, in Cedar Grove's expert's opinion, the building is "part 3-story [over] the basement and part 4-story on slab," due to the sloping topography of the lot. Cedar Grove's expert acknowledged that the property record card indicates that the story height for each of the four stories of the building "indicates ten feet." Moreover, he further testified that the property record card states that story height of the 4-story portion of the building was an "average, per story height [of] about 10 feet." In addition, the "average story height" of the 3-story portion of the building, including the basement, would be "about 10 feet," per the property record card. Cross examination of Cedar Grove's expert further disclosed that the property record card sketch recites "40' HT – 4 levels above grade" near the lobby area of the sketch and recites "30' HT – 3 levels above grade" near the sketch area depicting the building's basement.






However, when asked during cross-examination whether he disagreed with the average story height set forth on the property record card, Cedar Grove's expert stated, "yeah, I kinda do, I believe, my estimate was around 12 foot, that's what I had in my notes, about a 12-foot story height [for each story], . . . and that was just an estimate based on my exterior observations, I didn't physically measure it." He further stated, "I think it's higher than ten feet, I've been doing this for 42 years, I think that I can estimate pretty well." Thus, Cedar Grove's expert stated, that he found the property record card inaccurate, "in some respects."

However, during further cross-examination Cedar Grove's expert stated, "I had written 10 to 12 feet as my estimated height when I inspected it, I put 10 to 12 in my notes, and I believe I used 12 feet" in the appraisal report. Moreover, Cedar Grove's expert admitted during cross-examination that the building's average story-height is not stated anywhere in the appraisal report.

In Cedar Grove's expert's opinion, the height multiplier is "an aggregate over a base height and you are supposed to factor in, use the multiplier over the base cost . . . it applies to the building itself, the aggregate of the building, that would apply to the main section 3 in my report, that's why I have a whole height multiplier . . . this height multiplier is in excess of the base. . . ." Thus, in Cedar Grove's expert's opinion, "section 3 [includes] all the floors above the first floor."

Yet, when asked during cross-examination what the average story height and total height of the building was, Cedar Grove's expert replied, "10 feet would be the average [story height], we'll accept your 10 feet." Moreover, when asked during further cross-examination what the average story-height was of the second, third, and fourth floors, Cedar Grove's expert stated "around 12 feet." However, when pressed by Canterbury's counsel, he acknowledged that his inspection notes reflected an average story height of "10 to 12 feet."

According to Cedar Grove's expert the "stories above the 12-foot base [floor] was 24 feet,






[however,] it should be actually, 32 [feet]."[21]  In Cedar Grove's expert's opinion, the "base cost is based on a 12-foot [building] height, anything above that you use this table [Cost Manual Story Height Multipliers table] . . . it's for the height above the first floor, . . . it costs more to build a multi-story building than it does to build a one story, so why would you only use one floor . . . it's the average height above the first floor."

Canterbury offered rebuttal testimony from Canterbury's expert with respect to how building height should be factored, under the Cost Manual, for determining the base costs of a skilled nursing care facility.  Canterbury's expert testified that the Cost Manual "Nursing Homes (Convalescent Hospitals)," Section 15, page 26, expressly states that for "[m]ultistory buildings add .5% for each story over three, above ground, to all base costs, including basements."  Thus, under the Cost Manual, the costs to construct the first three stories of a skilled nursing facility are identical.  However, for each story above the third story, a .5% multiplier should be added to the base cost.  In Canterbury's expert's opinion, "that's how Marshall acknowledges that it costs more to build a 4-story building than a 3-story building."  According to Canterbury's expert, "that's how Marshall acknowledges the costs of construction of [multistoried skilled nursing care facilities]."

Moreover, in Canterbury's expert's opinion, the Cost Manual height multipliers should only be applied if: (i) the average story height of the building exceeds the 12-foot base story height, or (ii) the average story height is less than the 12-foot base story height.  In Canterbury's expert's opinion, Cedar Grove's expert's application of the height multiplier would result in a calculation that "implies that each floor is 36 feet high."

---

[21]  During cross examination, Cedar Grove's expert later stated that it should be 36 feet above the Cost Manual's 12-foot base height (12' per floor x 3 floors = 36 feet).  Accordingly, he further opined that the height multiplier should be 1.552 during each year under appeal.






The court finds the experts' testimony credible that a taller building will generally cost more to construct, per floor, than a shorter building. However, due to the confounding and inconsistent testimony offered by Cedar Grove's expert (i.e. that "we'll accept your 10 feet" average story height; his inspection notes reflected an average story height of "10 to 12 feet"; and that the average story height was "around 12 feet"), the court does not find credible Cedar Grove's expert's conclusions regarding the building's average story heights and application of the height multiplier.

Therefore, because it is undisputed that the subject property's building is a multistory "Nursing Home (Convalescent Hospital)" under the Cost Manual, the court will "add .5% for each story over three, above ground, to all base costs" as directed under Section 15, Page 26 of the Cost Manual. Accordingly, the court will add .5% to the adjusted base costs in determining the replacement cost for the building's 15,101 square feet of the fourth-floor area.

### d.    Elevators, backup generator, and site improvements

To determine the replacement costs for the building's elevators and parking area (including engineering, drainage, grading, paving, and signage), Cedar Grove's expert consulted the Cost Manual. Cedar Grove's expert's review of the Cost Manual (Section 15) revealed an estimated replacement cost for the building's two elevators of $230,900 to $314,900 per year (ranging from $87,250 to $92,000 per elevator; and per stop, ranging from $7,050 to $7,450). In addition, Cedar Grove's expert's review of the Cost Manual (Section 66) disclosed an estimated replacement cost for the building's parking area (including engineering, drainage, grading, paving, signage, etc.) of $110,400 to $158,100 per year (ranging from $1,380 to $1,470 per parking space).[22]

---

[22]  The court's review of Cedar Grove's expert's 2016 tax year "Cost Manual Calculations" (page 71) reveals a mathematical error in the "Adjusted Lump Sums." Cedar Grove's expert correctly






Canterbury's expert similarly employed the Cost Manual (Sections 15, 66, and 54) to determine the "Lump Sum" replacement costs for the building's elevators (ranging from $321,697 to $333,634), parking area (ranging from $162,500 to $173,100), and backup standby generator (ranging from $79,500 to $86,750). Canterbury's expert then applied the Cost Manual's economic life estimates (Section 97). In Canterbury's expert's opinion the subject property had approximately 63 parking spaces.[23]

    1.    Elevators and standby generator

The court's review of the Cost Manual and the experts' testimony reveals the following base costs and total replacement cost new (after applying the current cost and local cost multipliers), as of each valuation date, for a 4-story elevator in average condition:

| | 2016 Tax Year | 2017 Tax Year | 2018 Tax Year | 2019 Tax Year | 2020 Tax Year |
|---|---|---|---|---|---|
| Base Cost New x 2 elevators | $174,500 ($87,250 x 2) | $179,500 ($89,750 x 2) | $179,500 ($89,750 x 2) | $184,000 ($92,000 x 2) | $184,000 ($92,000 x 2) |
| Plus: 4 stops x 2 elevators | +$56,400 ($7,050 x 4 x 2) | +$57,600 ($7,200 x 4 x 2) | +$57,600 ($7,200 x 4 x 2) | +$59,600 ($7,450 x 4 x 2) | $59,600 ($7,450 x 4 x 2) |
| Total Base Cost | $230,900 | $237,100 | $237,100 | $243,600 | $243,600 |
| Plus: Current & Local cost multiplier | 1.07 1.27 | 1.04 1.30 | 1.06 1.28 | 1.07 1.27 | 1.07 1.28 |
| **Total Repl. Cost** | **$313,770** | **$320,559** | **$321,697** | **$331,028** | **$333,635** |

In addition, the court finds that Canterbury's expert's base replacement cost new for the building's diesel drive standby generator of: (i) $79,500, as of the October 1, 2015 and October 1, 2016 valuation dates; (ii) $80,500, as of the October 1, 2017 and October 1, 2018 valuation dates;

computed the replacement cost of: (i) the elevators as $230,900; and (ii) the parking area as $110,400. Moreover, he correctly identified the current cost multiplier of 1.07 and the local cost multiplier of 1.27. However, he reported the sum of those two figures as $444,900, when the correct calculation is $463,793 ($230,900 x 1.07 x 1.27 = $313,770; $110,400 x 1.07 x 1.27 = $150,023; $293,243 + $150,023 = $463,793).

[23] Canterbury's expert initially testified that the subject property had 69 parking spaces but on redirect he clarified that after further examination he determined it possessed 63 parking spaces.


Interpreter


ADA
Americans with Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



and (iii) $86,750, as of the October 1, 2019 valuation dates, are consistent with the Cost Manual.

Accordingly, after applying the current and local cost multipliers to the base cost of the standby generator, the total replacement cost new is as follows:

| | 2016 Tax Year | 2017 Tax Year | 2018 Tax Year | 2019 Tax Year | 2020 Tax Year |
|---|---|---|---|---|---|
| Base Cost New Standby generator | $79,500 | $79,500 | $80,500 | $80,500 | $86,750 |
| Plus: Current & Local cost multiplier | 1.07 1.27 | 1.04 1.30 | 1.06 1.28 | 1.07 1.27 | 1.07 1.28 |
| **Total Repl. Cost** | **$108,033** | **$107,484** | **$109,222** | **$109,391** | **$118,813** |

Accordingly, the court finds that the replacement cost new of the building's elevators and standby generator is: (i) $421,803, as of the October 1, 2015 valuation date ($313,770 + $108,033 = $421,803); (ii) $428,043, as of the October 1, 2016 valuation date ($320,559 + $107,484 = $428,043); (iii) $430,919, as of the October 1, 2017 valuation date ($321,697 + $109,222 = $430,919); (iv) $440,419, as of the October 1, 2018 valuation date ($331,028 + $109,391 = $440,419); and (v) $452,448, as of the October 1, 2019 valuation date ($333,635 + $118,813 = $452,448).

2.    Parking areas, curbing, and landscaping

The court finds credible Cedar Grove's expert's testimony that the subject property includes parking for approximately eighty (80) vehicles. The court's review of the property record card discloses that there is approximately 53,230 square feet of asphalt parking area/driveways. Based on the court's review of the subject property's photographs and how the site's majority is comprised of asphalt area/driveways, the court concludes that Cedar Grove's estimate is more credible and reasonable.

Thus, based on the court's review of the Cost Manual, Section 66, "Surface Parking Lots," and the experts' testimony, the base cost of the parking areas are as follows: (i) $110,400, as of






the October 1, 2015 valuation date; (ii) $113,600, as of the October 1, 2016 and October 1, 2017

valuation dates; and (iii) $117,600, as of the October 1, 2018 and October 1, 2019 valuation dates.

In addition, the court accepts Canterbury's expert's testimony regarding the base costs of the

concrete sidewalks and pad, concrete curbing, and landscaping each year.

Accordingly, the replacement cost new of the subject property's parking areas, concrete

curbing, and landscaping (the "Site Improvements") are as follows:

| | 2016 Tax Year | 2017 Tax Year | 2018 Tax Year | 2019 Tax Year | 2020 Tax Year |
|---|---|---|---|---|---|
| Parking areas | $110,400 ($1,380 x 80) | $113,600 ($1,420 x 80) | $113,600 ($1,420 x 80) | $117,600 ($1,470 x 80) | $117,600 ($1,470 x 80) |
| Plus: Concrete sidewalk & Pad | +$23,500 | +$24,200 | +$24,200 | +$25,000 | +$25,000 |
| Plus: Concrete Curbing | +$17,400 | +$17,900 | +$17,900 | +$18,500 | +$18,500 |
| Plus: Landscaping | +$26,400 | +$27,200 | +$27,200 | +$28,200 | +$28,200 |
| Total Base Cost | $177,700 | $182,900 | $182,900 | $189,300 | $189,300 |
| Plus: Current & Local cost multiplier | 1.07 1.27 | 1.04 1.30 | 1.06 1.28 | 1.07 1.27 | 1.07 1.28 |
| Total Repl. Cost | $241,477 | $247,281 | $248,159 | $257,240 | $259,265 |

e.    Depreciation and Obsolescence

In Canterbury's expert's opinion, the site improvements (parking area, concrete sidewalks,

curbs, and landscaping) have a shorter life expectancy than the building. After reviewing the Cost

Manual, he estimated that the parking area had an economic life of 8 years, the concrete sidewalks

and curbing had an economic life of 19 years, and the landscaping had an economic life of 10

years. Thus, Canterbury's expert applied a depreciation value to the replacement cost new of the

site improvements as follows: (i) 40%, as of the October 1, 2015 valuation date; (ii) 45%, as of the

October 1, 2016 valuation date; (iii) 50%, as of the October 1, 2017 valuation date; (iv) 55%, as

of the October 1, 2018 valuation date; and (v) 60%, as of the October 1, 2019 valuation date.

In addition, Canterbury's expert applied physical depreciation factors ranging from 40%

to 47.5% to the subject property's building during the tax years at issue. Conversely, after






consulting the Cost Manual, Cedar Grove's expert applied a physical depreciation factor of 30% to the subject property's building and site improvements during all tax years.

Moreover, Canterbury's expert attributed ten percent (10%) each year to the building's functional obsolescence, while Cedar Grove's expert attributed five percent (5%) each year to the building's functional obsolescence.[24]

### 1. Physical Depreciation

Depreciation represents the market's recognition of the "loss[] in value of improvements due to the effects of age, wear and tear, and other causes. . . ." The Appraisal of Real Estate, at 576. See Marina Dist. Dev. Co., LLC v. City of Atl. City, 27 N.J. Tax 469, 519 (Tax 2013) (concluding that depreciation is the "loss in value from three causes: physical depreciation, functional obsolescence and external economic factors"). Published depreciation tables and mathematical formulas are available to attempt to quantify or estimate depreciation. However, determining when depreciation is appropriate and the appropriate factor to be applied must be based on an appraiser's physical observations and interpretation of how "the market perceives the collective effect of all forms of depreciation." The Appraisal of Real Estate, at 576.

Although the experts employed the economic age-life method to discern the physical depreciation factors to be applied to the subject property's improvements, the experts reached different depreciation factor conclusions. The economic age-life method

> estimates total depreciation by 'calculating the ratio of the effective age of the property to its economic life expectancy and applying the ratio to the property's total cost.' The economic age-life method is the simplest way to estimate depreciation. The age-life method is a

---

[24] Canterbury's expert's appraisal report also states that the subject property "suffers from depreciation in the form of external (economic) obsolescence resulting in income/rental loss. However, this [is] offset[] by the strong occupancy at the subject property. Therefore, no adjustment for external obsolescence was made."






> reliable estimate of depreciation and obsolescence when using the
> cost approach of valuation.
>
> [Regent Care, 27 N.J. Tax at 153 (internal citations omitted).]

In Canterbury's expert's opinion due to "the intensity and use of the improvements," despite continuing renovations and repairs, "the facility cannot keep pace with the inherent daily physical wear and tear." Accordingly, Canterbury's expert opined that the building had an effective age ranging from 16 to 19 years, based on the varying replacement cost dates. Moreover, his review of the Cost Manual Life Expectancy Guidelines revealed that an average, Class C skilled nursing care facility has a forty (40) year life expectancy. However, instead of following the Cost Manual's published Depreciation schedule, Canterbury's expert computed his physical depreciation as follows: (i) 16 yrs. eff. age ÷ 40 = 40%, as of the October 1, 2015 valuation date; (ii) 17 yrs. eff. age ÷ 40 = 42.50%, as of the October 1, 2016 valuation date; (iii) 18 yrs. eff. age ÷ 40 = 45%, as of the October 1, 2017 valuation date; (iv) 19 yrs. eff. age ÷ 40 = 47.50%, as of the October 1, 2018 valuation date; and (v) 17 yrs. eff. age ÷ 40 = 42.50%, as of the October 1, 2019 valuation date.[25]

In Cedar Grove's expert's opinion, after inspecting the subject property, reviewing building permits (including the recent renovations to the building's first floor), and consulting the Cost Manual's Life Expectancy Guidelines for average, Class C skilled nursing care facilities, he similarly concluded that a skilled nursing care facility has a forty (40) year typical life expectancy. However, in Cedar Grove's expert's opinion, due to continued repairs, maintenance, and renovations, the building and improvements had an effective age of twenty (20) years, as of all

---

[25] During trial, Canterbury's expert amended certain depreciation rates set forth under his appraisal report as follows: (i) 50%, as of the October 1, 2017 valuation date; and (ii) 55%, as of the October 1, 2018 valuation date.






replacement cost dates. Cedar Grove's expert then consulted the Cost Manual's published "Depreciation-Commercial Properties" tables and found that a building having an effective age of twenty (20) years with a typical life expectancy of forty (40) years will have a depreciation factor of thirty percent (30%). Accordingly, Cedar Grove's expert opined that a thirty percent (30%) depreciation factor should be applied to the building and improvements as of each valuation date involved herein.

Here, the court finds Canterbury's expert's depreciation calculation with respect to the subject property's Site Improvements to be more credible and appropriately takes into consideration the site improvements' differing economic life timetable. Accordingly, the court will apply a depreciation factor to the subject property's Site Improvements as follows: (i) 40%, as of the October 1, 2015 valuation date; (ii) 45%, as of the October 1, 2016 valuation date; (iii) 50%, as of the October 1, 2017 valuation date; (iv) 55%, as of the October 1, 2018 valuation date; and (v) 60%, as of the October 1, 2019 valuation date.

However, the court finds Cedar Grove's expert's application and use of the Cost Manual's depreciation tables will more accurately account for the building's depreciation. Cedar Grove's expert credibly testified that he contacted CoreLogic Marshall & Swift and confirmed that the depreciation tables published in the Cost Manual include Section 15 "Nursing Homes (Convalescent Hospitals)" and account for the intensity of their daily use. Here, the experts employed and relied on the Cost Manual to determine the replacement cost new of all the building's components and the court finds no reason to now depart from the Cost Manual in the determination of the appropriate depreciation factor to be applied to those replacement costs.

Accordingly, the court accepts Cedar Grove's expert's depreciation factor of thirty (30%) percent for the subject property's building, elevators, and generator, as of each valuation date






involved herein.

### 2. Functional Obsolescence

"Functional obsolescence is caused by a flaw in the structure, materials, or design of an improvement when the improvement is compared with the highest and best use and most cost-effective functional design requirements at the time of the appraisal. . . ." Appraisal Institute, The Appraisal of Real Estate, 583 (15th ed. 2020). Functional obsolescence may be curable or incurable, however fundamental to its application, a functional deficiency must exist on the property. Stated differently, "some aspect of the subject property is below standard in respect to market norms." Ibid. Key to examination of functional obsolescence is whether the obsolescence is curable or incurable. The curability of the obsolescence "is important because curable obsolescence 'can be measured in terms of cost,' whereas incurable obsolescence 'must be estimated in terms of a percentage.'" Westwood Lanes, Inc. v. Garwood Borough, 24 N.J. Tax 239, 262 (Tax 2008) (quoting RCA Corp. v. East Windsor Twp., 1 N.J. Tax 481, 502 (Tax 1980)).[26]

Canterbury's expert viewed the subject property as suffering from functional obsolescence because it lacked several key features that modern skilled nursing care facilities possess, including: (i) the lack of an integrated and direct oxygen station in the units/patient rooms; (ii) the backup generator services only portions of the building; (iii) newly constructed senior care housing

---

[26] Two tests exist to gauge whether a condition is curable, (i) "[i]f spending the money to cure the item will result in a value increment equal to or greater than the expenditure . . . ; (ii)] [i]f spending the money to cure the item will not result in a value increment equal to or greater than the expenditure but will allow existing items to maintain their value. . . ." Westwood Lanes, Inc., 24 N.J. Tax at 262. If so, the condition or item is viewed as curable. Conversely, the condition or component is not curable "[i]f the cost to cure the item will not result in a value increment greater than the loss in value caused by the item or building component. . . ." Ibid.






facilities possess, on average, gross building areas, per patient bed, of approximately 724 square feet, while the subject property has a gross building area, per patient bed, of approximately 336 square feet; (iv) semi-private rooms possess only a bathroom with a toilet and vanity; and (v) approximately thirty heat pumps in units/patient rooms were not properly working.[27]

In addition, Canterbury's expert detailed that changes were implemented to the Medicaid payment system in 2014, shifting away from a direct payment arrangement and toward a managed care model. In Canterbury's expert's opinion, these funding changes resulted in New Jersey experiencing a surplus of skilled nursing care beds, as less patients occupied skilled nursing facilities, gravitating instead to newer facilities providing ALMC services.[28] Accordingly, for these reasons, Canterbury's expert applied a ten percent (10%) functional obsolescence factor each tax year.

Cedar Grove's expert similarly observed that: (i) the units/patient rooms are not serviced by a "direct, in-room oxygen" system; and (ii) although a backup generator is present, the generator does not service the entire building. Therefore, Cedar Grove's expert opined that those issues were curable functional obsolescence, applying a five percent (5%) curable functional obsolescence

---

[27] During cross-examination Canterbury's expert could not identify how long these heat pumps were not working. In addition, Canterbury's expert also expressed his opinion that the hot water baseboard heating system was needed because the "Package A/C" system was inadequate. However, no testimony was offered during trial from a representative of Canterbury that the hot water baseboard heating system was subsequently installed in the building to address alleged inadequacies of the "Package A/C" system. Rather, from the photographs presented, it appears that the hot water baseboard heating was installed at the time the building was constructed.

[28] Canterbury's expert included this point in attempting to highlight the differences between the subject property's facility and more modern senior care facilities. However, the court finds that the alleged stagnation New Jersey is experiencing in the construction of new skilled nursing care facilities would be more appropriately characterized as an item of economic or external obsolescence. External obsolescence is defined as "a diminution in value caused by negative externalities and generally incurable on the part of the owner, landlord, or tenant." The Dictionary of Real Estate Appraisal, at 73. Here, the court applies no deduction for external obsolescence.






factor. According to Cedar Grove's expert, the five percent (5%) was applied "to recognize the fact that it does not have in-room oxygen, that's something that modern facilities have. I don't believe in the subject instance that it's a detriment, as a matter of fact, they're actually advertising [on their website] . . . they basically talk about advanced respiratory services, 24/7 respiratory therapists . . . respiratory therapy treatments, then they talk about high-flow oxygen therapy, and breathing exercises . . . but if it was such a detriment to the facility, I don't think that they would be advertising it."

The court finds that Canterbury's expert's opinion recognizes that "older facilities are becoming obsolete in markets where newer or renovated . . . nursing facilities that offer greater privacy, therapy, and other quality-of-life design features are being developed." The Appraisal of Nursing Facilities at 89. As the senior care facility industry has evolved, skilled "nursing facility building areas have increased to meet growing requirements for increased functional space coming from the Americans with Disability Act (ADA) and competitive market conditions. New . . . facility designs typically call for building areas with substantially more than 500 square feet per bed." Id. at 90.

The court accords the greatest weight to the considerations given by Canterbury's expert to the current specifications of skilled nursing care facilities, including the presence of in-room oxygen, building-wide standby generator systems, and the average gross building area, per patient bed, of newer skilled nursing care facilities being constructed. Accordingly, the court accepts Canterbury's expert's functional obsolescence deduction of ten percent (10%) per year.

      f.    Entrepreneurial Profit

Entrepreneurial profit "reflects the difference between a property's total cost and its value after completion." Regent Care, 27 N.J. Tax at 150 (citing The Appraisal of Real Estate, 388 (13th






ed. 2008)). It is the anticipated compensation that an entrepreneur would expect to receive as a return on investment "for the risk and expertise associated with development." The Dictionary of Real Estate Appraisal, at 67. Simply stated, it denotes "the difference between the total of (1) the cost of acquiring land plus (2) the cost of constructing an improvement and the improved property's market value." Westwood Lanes, Inc., 24 N.J. Tax at 250. Our courts have adopted the approach that entrepreneurial profit is a factor that should be considered in developing the market value of a property when "the developer or owner-operator makes improvements to property with the anticipation of realizing a profit on its subsequent resale." Westwood Lanes, Inc., 24 N.J. Tax at 249 (citing Lawrence Assocs. v. Lawrence Twp., 5 N.J. Tax 481, 535 (Tax 1983)).

Here, Canterbury's expert applied a five percent (5%) entrepreneurial profit to his concluded depreciated value of the building and Site Improvements. In Canterbury's expert's opinion, "an investor/entrepreneur investing capital into this kind of property is typically an owner/operator as these types of facilities are never built 'on-spec.'" The owner/operator of a skilled nursing care facility enters "into an enterprise . . . comprised of both real property, as well as a going business concern due to the intermingling of both the real property in which operations take place. . . ." In his opinion, the owner/operator will expect to receive "compensation for their efforts in the form of both return on the real property as well as a return from the business venture." Therefore, Canterbury's expert applied a five percent (5%) entrepreneurial profit to the building and Site Improvements, based on his discussions "with market participants, . . . developers . . . owner-users, . . . [and] investors who are building those [senior care facility] buildings."

For substantially the same reasons, Cedar Grove's expert concluded that a ten percent (10%) entrepreneurial profit should be applied to the depreciated value of the building and Site Improvements.






The court finds, as did both experts, that the owner/operator of a skilled nursing care facility would reasonably expect to be compensated for its efforts and risk associated with developing and operating a skilled nursing care facility. See Twin Oaks Assoc., 9 N.J. Tax at 397. Moreover, the court's examination of legal precedent has disclosed that no rigid formula exists for calculating entrepreneurial profit. Rather, entrepreneurial profit should be determined "through market research, usually through interviews with developers and other market participants about anticipated, acceptable, and actual levels of profit achieved in the market." The Appraisal of Real Estate, 537 (15th ed. 2020).

Here, the court finds Cedar Grove's expert's application of a ten percent (10%) entrepreneurial profit factor more credible and reasonable in gauging the profit that an owner/operator of a skilled nursing care facility would anticipate from their development and operation of a skilled nursing care facility.

Accordingly, the court calculates the replacement cost new of the building and Site Improvements, including entrepreneurial profit, less depreciation and functional obsolescence as follows:

   

| | Section 1 (1st Floor) 5,401 sq. ft. | Section 2 (Basement) 9,700 sq. ft. | Section 3 (a) (2nd & 3rd floor units) 26,401 sq. ft. | Section 3(b) (4th floor units) 13,223 sq. ft. | Section 4(a) (2nd & 3rd floor core) 3,784 sq. ft. | Section 4(b) (4th floor core) 1,895 sq. ft. |
|---|---|---|---|---|---|---|
| | | | Totaling 39,624 sq. ft. | | Totaling 5,679 sq. ft. | |
| Base Cost New | $134.77 | $81.43 | $134.77 | $134.77 | $134.77 | $134.77 |
| Less: Package A.C. | -$18.10 | -$12.75 | -$18.10 | -$18.10 | $0.00 | $0.00 |
| Plus: HWBB | +$19.65 | +$19.65 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: A/C | +$5.39 | +$5.39 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: Heat pumps | $0.00 | $0.00 | +$8.57 | +$8.57 | $0.00 | $0.00 |
| Plus: Wet sprinkler | +$2.75 | +$2.75 | +$2.75 | +$2.75 | +$2.75 | +$2.75 |
| Adj. Base Cost | $144.46 | $96.47 | $127.99 | $127.99 | $137.52 | $137.52 |
| | | | | | | |
| 4th Fl. Multistory Bldgs. (0.5%) | N/A | N/A | N/A | $128.63 | N/A | $138.21 |
| | | | | | | |
| Current & Local Cost Multiplier | 1.07 1.27 | 1.07 1.27 | 1.07 1.27 | 1.07 1.27 | 1.07 1.27 | 1.07 1.27 |
| | | | | | | |
| Adj. Cost New | $196.31 | $131.09 | $173.93 | $174.80 | $186.88 | $187.81 |
| | | | | | | |
| Repl. Cost New (RCN) | $1,060,270 | $1,271,573 | $4,591,926 | $2,311,380 | $707,154 | $355,900 |
| Total: Sections 1, 2, 3(a), 3(b), 4(a), and 4(b) | | | | | | $10,298,203 |
| RCN Elevators & Standby Generator | | | | | | $421,803 |
| Total RCN Building | | | | | | $10,720,006 |

*2016 Tax Year*

| | | |
|---|---|---|
| Total RCN Building | $10,720,006 | |
| Entrepreneurial Profit (10%) | $ 1,072,001 | |
| Total | $11,792,007 | |
| Less: Building Depreciation (30%) | $ 3,537,602 | |
| Less: Functional Obsolescence (10%) | $ 1,179,201 | |
| Total Depreciated Cost Building | | $ 7,075,204 |
| | | |
| Total RCN Site Improvements | $ 241,477 | |
| Entrepreneurial Profit (10%) | $ 24,148 | |
| Total | $ 265,625 | |
| Less: Site Improvements Depreciation (40%) | $ 106,250 | |
| Total Depreciated Cost Site Improvements | | $ 159,375 |
| | | |
| Total Depreciated Cost Building | | $ 7,075,204 |
| Total Depreciated Cost Site Improvements | | $ 159,375 |
| Plus: Land Value | | $ 2,690,000 |
| Total Value | | $ 9,924,579 |
| | | |
| **CONCLUDED VALUE** | | **$ 9,925,000** |






| | | | 2017 Tax Year | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Totaling 39,624 sq. ft. | | Totaling 5,679 sq. ft. | |
| | Section 1 (1st Floor) 5,401 sq. ft. | Section 2 (Basement) 9,700 sq. ft. | Section 3 (a) (2nd & 3rd floor units) 26,401 sq. ft. | Section 3(b) (4th floor units) 13,223 sq. ft. | Section 4(a) (2nd & 3rd floor core) 3,784 sq. ft. | Section 4(b) (4th floor core) 1,895 sq. ft. |
| Base Cost New | $139.62 | $83.96 | $139.62 | $139.62 | $139.62 | $139.62 |
| Less: Package A.C. | -$18.60 | -$13.10 | -$18.60 | -$18.60 | $0.00 | $0.00 |
| Plus: HWBB | +$20.20 | +$20.20 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: A/C | +$5.55 | +$5.55 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: Heat pumps | $0.00 | $0.00 | +$8.83 | +$8.83 | $0.00 | $0.00 |
| Plus: Wet sprinkler | +$2.84 | +$2.84 | +$2.84 | +$2.84 | +$2.84 | +$2.84 |
| Adj. Base Cost | $149.61 | $99.45 | $132.69 | $132.69 | $142.46 | $142.46 |
| | | | | | | |
| 4th Fl. Multistory Bldgs. (0.5%) | N/A | N/A | N/A | $133.35 | N/A | $143.17 |
| | | | | | | |
| Current & Local Cost Multiplier | 1.04 1.30 | 1.04 1.30 | 1.04 1.30 | 1.04 1.30 | 1.04 1.30 | 1.04 1.30 |
| | | | | | | |
| Adj. Cost New | $202.27 | $134.46 | $179.40 | $180.29 | $192.61 | $193.57 |
| | | | | | | |
| Repl. Cost New (RCN) | $1,092,460 | $1,304,262 | $4,736,339 | $2,383,975 | $728,836 | $366,815 |
| Total: Sections 1, 2, 3(a), 3(b), 4(a), and 4(b) | | | | | | $10,612,687 |
| RCN Elevators & Standby Generator | | | | | | $428,043 |
| Total RCN Building | | | | | | $11,040,730 |

Total RCN Building                                                           $11,040,730

Entrepreneurial Profit (10%)    $ 1,104,073

        Total                $12,144,803

        Less: Building Depreciation (30%)    $ 3,643,441

        Less: Functional Obsolescence (10%)    $ 1,214,480

        Total Depreciated Cost Building    $ 7,286,882

Total RCN Site Improvements    $ 247,281

Entrepreneurial Profit (10%)    $ 24,728

        Total    $ 272,009

        Less: Site Improvements Depreciation (45%)    $ 122,404

        Total Depreciated Cost Site Improvements    $ 149,605

            Total Depreciated Cost Building    $ 7,286,882

            Total Depreciated Cost Site Improvements    $ 149,605

            Plus: Land Value    $ 2,690,000

            Total Value    $10,126,487

            **CONCLUDED VALUE**    **$10,125,000**






| | Section 1 (1st Floor) 5,401 sq. ft. | Section 2 (Basement) 9,700 sq. ft. | Section 3 (a) (2nd & 3rd floor units) 26,401 sq. ft. | Section 3(b) (4th floor units) 13,223 sq. ft. | Section 4(a) (2nd & 3rd floor core) 3,784 sq. ft. | Section 4(b) (4th floor core) 1,895 sq. ft. |
|---|---|---|---|---|---|---|
| **2018 Tax Year** | | | Totaling 39,624 sq. ft. | | Totaling 5,679 sq. ft. | |
| Base Cost New | $139.62 | $83.96 | $139.62 | $139.62 | $139.62 | $139.62 |
| Less: Package A.C. | -$18.60 | -$13.10 | -$18.60 | -$18.60 | $0.00 | $0.00 |
| Plus: HWBB | +$20.20 | +$20.20 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: A/C | +$5.55 | +$5.55 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: Heat pumps | $0.00 | $0.00 | +$8.83 | +$8.83 | $0.00 | $0.00 |
| Plus: Wet sprinkler | +$2.84 | +$2.84 | +$2.84 | +$2.84 | +$2.84 | +$2.84 |
| Adj. Base Cost | $149.61 | $99.45 | $132.69 | $132.69 | $142.46 | $142.46 |
| | | | | | | |
| 4th Fl. Multistory Bldgs. (0.5%) | N/A | N/A | N/A | $133.35 | N/A | $143.17 |
| | | | | | | |
| Current & Local Cost Multiplier | 1.06 1.28 | 1.06 1.28 | 1.06 1.28 | 1.06 1.28 | 1.06 1.28 | 1.06 1.28 |
| | | | | | | |
| Adj. Cost New | $202.99 | $134.93 | $180.03 | $180.93 | $193.29 | $194.25 |
| | | | | | | |
| Repl. Cost New (RCN) | $1,096,349 | $1,308,821 | $4,752,972 | $2,392,437 | $731,409 | $368,104 |
| Total: Sections 1, 2, 3(a), 3(b), 4(a), and 4(b) | | | | | | $10,650,092 |
| RCN Elevators & Standby Generator | | | | | | $430,919 |
| Total RCN Building | | | | | | $11,081,011 |

```
Total RCN Building                                  $11,081,011
Entrepreneurial Profit (10%)                        $ 1,108,101
        Total                                       $12,189,112
        Less: Building Depreciation (30%)           $ 3,656,734
        Less: Functional Obsolescence (10%)         $ 1,218,911
        Total Depreciated Cost Building                           $ 7,313,467

Total RCN Site Improvements                         $    248,159
Entrepreneurial Profit (10%)                        $     24,816
        Total                                       $    272,975
        Less: Site Improvements Depreciation (50%)  $    136,487
        Total Depreciated Cost Site Improvements                  $    136,487

        Total Depreciated Cost Building                           $ 7,313,467
        Total Depreciated Cost Site Improvements                  $    136,487
        Plus: Land Value                                          $ 2,690,000
        Total Value                                               $10,139,954

        CONCLUDED VALUE                                           $10,140,000
```






| | Section 1 (1st Floor) 5,401 sq. ft. | Section 2 (Basement) 9,700 sq. ft. | Section 3 (a) (2nd & 3rd floor units) 26,401 sq. ft. | Section 3(b) (4th floor units) 13,223 sq. ft. | Section 4(a) (2nd & 3rd floor core) 3,784 sq. ft. | Section 4(b) (4th floor core) 1,895 sq. ft. |
|---|---|---|---|---|---|---|
| **2019 Tax Year** | | | | | | |
| | | | Totaling 39,624 sq. ft. | | Totaling 5,679 sq. ft. | |
| Base Cost New | $144.00 | $86.50 | $144.00 | $144.00 | $144.00 | $144.00 |
| Less: Package A.C. | -$19.15 | -$13.55 | -$19.15 | -$19.15 | $0.00 | $0.00 |
| Plus: HWBB | +$20.80 | +$20.80 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: A/C | +$5.72 | +$5.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: Heat pumps | $0.00 | $0.00 | +$9.08 | +$9.08 | $0.00 | $0.00 |
| Plus: Wet sprinkler | +$2.93 | +$2.93 | +$2.93 | +$2.93 | +$2.93 | +$2.93 |
| Adj. Base Cost | $154.30 | $102.40 | $136.86 | $136.86 | $146.93 | $146.93 |
| | | | | | | |
| 4th Fl. Multistory Bldgs. (0.5%) | N/A | N/A | N/A | $137.54 | N/A | $147.67 |
| | | | | | | |
| Current & Local Cost Multiplier | 1.07 1.27 | 1.07 1.27 | 1.07 1.27 | 1.07 1.27 | 1.07 1.27 | 1.07 1.27 |
| | | | | | | |
| Adj. Cost New | $209.68 | $139.15 | $185.98 | $186.90 | $199.66 | $200.67 |
| | | | | | | |
| Repl. Cost New (RCN) | $1,132,482 | $1,349,755 | $4,910,058 | $2,471,379 | $755,513 | $380,270 |
| Total: Sections 1, 2, 3(a), 3(b), 4(a), and 4(b) | | | | | | $10,999,457 |
| RCN Elevators & Standby Generator | | | | | | $440,419 |
| Total RCN Building | | | | | | $11,439,876 |

| | |
|---|---|
| Total RCN Building | $11,439,876 |
| Entrepreneurial Profit (10%) | $ 1,143,988 |
| Total | $12,583,864 |
| Less: Building Depreciation (30%) | $ 3,775,159 |
| Less: Functional Obsolescence (10%) | $ 1,258,386 |
| Total Depreciated Cost Building | $ 7,550,319 |
| | |
| Total RCN Site Improvements | $ 257,240 |
| Entrepreneurial Profit (10%) | $ 25,724 |
| Total | $ 282,964 |
| Less: Site Improvements Depreciation (55%) | $ 155,630 |
| Total Depreciated Cost Site Improvements | $ 127,334 |
| | |
| Total Depreciated Cost Building | $ 7,550,319 |
| Total Depreciated Cost Site Improvements | $ 127,334 |
| Plus: Land Value | $ 2,690,000 |
| Total Value | $10,367,653 |
| | |
| **CONCLUDED VALUE** | **$10,370,000** |






| | Section 1 (1st Floor) 5,401 sq. ft. | Section 2 (Basement) 9,700 sq. ft. | Section 3 (a) (2nd & 3rd floor units) 26,401 sq. ft. | Section 3(b) (4th floor units) 13,223 sq. ft. | Section 4(a) (2nd & 3rd floor core) 3,784 sq. ft. | Section 4(b) (4th floor core) 1,895 sq. ft. |
|---|---|---|---|---|---|---|
| **2020 Tax Year** | | | | | | |
| | | | Totaling 39,624 sq. ft. | | Totaling 5,679 sq. ft. | |
| Base Cost New | $144.00 | $86.50 | $144.00 | $144.00 | $144.00 | $144.00 |
| Less: Package A.C. | -$19.15 | -$13.55 | -$19.15 | -$19.15 | $0.00 | $0.00 |
| Plus: HWBB | +$20.80 | +$20.80 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: A/C | +$5.72 | +$5.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| Plus: Heat pumps | $0.00 | $0.00 | +$9.08 | +$9.08 | $0.00 | $0.00 |
| Plus: Wet sprinkler | +$2.93 | +$2.93 | +$2.93 | +$2.93 | +$2.93 | +$2.93 |
| Adj. Base Cost | $154.30 | $102.40 | $136.86 | $136.86 | $146.93 | $146.93 |
| | | | | | | |
| 4th Fl. Multistory Bldgs. (0.5%) | N/A | N/A | N/A | $137.54 | N/A | $147.67 |
| | | | | | | |
| Current & Local Cost Multiplier | 1.07 1.28 | 1.07 1.28 | 1.07 1.28 | 1.07 1.28 | 1.07 1.28 | 1.07 1.28 |
| | | | | | | |
| Adj. Cost New | $211.33 | $140.25 | $187.44 | $188.38 | $201.24 | $202.25 |
| | | | | | | |
| Repl. Cost New (RCN) | $1,141,393 | $1,360,425 | $4,948,603 | $2,490,949 | $761,492 | $383,264 |
| Total: Sections 1, 2, 3(a), 3(b), 4(a), and 4(b) | | | | | | $11,086,126 |
| RCN Elevators & Standby Generator | | | | | | $452,448 |
| Total RCN Building | | | | | | $11,538,574 |

Total RCN Building $11,538,574
Entrepreneurial Profit (10%) $ 1,153,857
    Total $12,692,431
    Less: Building Depreciation (30%) $ 3,807,729
    Less: Functional Obsolescence (10%) $ 1,269,243
    Total Depreciated Cost Building $ 7,615,459

Total RCN Site Improvements $ 259,265
Entrepreneurial Profit (10%) $ 25,927
    Total $ 285,192
    Less: Site Improvements Depreciation (60%) $ 171,115
    Total Depreciated Cost Site Improvements $ 114,077

        Total Depreciated Cost Building $ 7,615,459
        Total Depreciated Cost Site Improvements $ 114,077
        Plus: Land Value $ 2,690,000
        Total Value $10,419,536

        **CONCLUDED VALUE** **$10,420,000**






    3.     Corrected property tax assessment

Having reached a conclusion of the subject property's true or fair market value for the 2016, 2017, 2018, 2019, and 2020 tax years, the court will endeavor to determine the correct tax assessments. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied by the evidence presented, in a non-revaluation year, "that the ratio of the assessed valuation . . . to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property . . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). Importantly, under N.J.S.A. 54:51A-6(b), if the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, judgment is to be entered by applying the average ratio to the true value of the property. The county percentage level in all cases is 100%. See M.I. Holdings, Inc. v. Jersey City, 12 N.J. Tax 129, 145 (Tax 1991).

For the 2016 tax year, Cedar Grove's average ratio was 95.43%; the lower limit of the common level range was 81.12% and the upper limit of the common level range exceeded 100% and therefore, is 100%.[29] The total assessed value, $11,250,000, to true market value, $9,925,000, yields a ratio of 113.35%, which exceeds 100%. Consequently, the subject property's revised 2016 tax year assessment calculation is as follows:

---

[29] As recited in the annual State of New Jersey, Department of the Treasury, Division of Taxation Certification of the Average Ratios, "[r]atios in excess of 100% are to be considered at 100%." See also N.J.S.A. 54:51A-6(b); Passaic Street Realty Assoc. v. Garfield City, 13 N.J. Tax 482 (Tax 1994); Caulfield v. Surf City Borough, 14 N.J. Tax 118 (Tax 1994).






$9,925,000     x     .9543  =     $9,471,000 [ROUNDED]

Accordingly, a judgment establishing the subject property's local property tax assessment for the 2016 tax year will be entered as follows:

| | |
|---|---|
| Land | $2,600,000 |
| Improvement | $6,871,000 |
| Total | $9,471,000 |

For the 2017 tax year, Cedar Grove's average ratio was 96.84%; the lower limit of the common level range was 82.31% and the upper limit of the common level range exceeded 100% and therefore, is 100%. The total assessed value, $11,250,000, to true market value, $10,125,000, yields a ratio of 111.11%, which exceeds 100%. Consequently, the subject property's revised 2017 tax year assessment calculation is as follows:

$10,125,000   x     .9684  =     $9,805,000 [ROUNDED]

Accordingly, a judgment establishing the subject property's local property tax assessment for the 2017 tax year will be entered as follows:

| | |
|---|---|
| Land | $2,600,000 |
| Improvement | $7,205,000 |
| Total | $9,805,000 |

For the 2018 tax year, Cedar Grove's average ratio was 96.74%; the lower limit of the common level range was 82.23% and the upper limit of the common level range exceeded 100% and therefore, is 100%. The total assessed value, $11,250,000, to true market value, $10,140,000, yields a ratio of 110.95%, which exceeds 100%. Consequently, the subject property's revised 2018 tax year assessment calculation is as follows:

$10,140,000   x     .9674  =     $9,810,000 [ROUNDED]

Accordingly, a judgment establishing the subject property's local property tax assessment






for the 2018 tax year will be entered as follows:

| | |
|---|---|
| Land | $2,600,000 |
| Improvement | $7,210,000 |
| Total | $9,810,000 |

For the 2019 tax year, Cedar Grove's average ratio was 96.09%; the lower limit of the common level range was 81.68% and the upper limit of the common level range exceeded 100% and therefore, is 100%. The total assessed value, $11,250,000, to true market value, $10,370,000, yields a ratio of 108.49%, which exceeds 100%. Consequently, the subject property's revised 2019 tax year assessment calculation is as follows:

$$\$10,370,000 \quad x \quad .9609 \ = \ \$9,970,000 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the subject property's local property tax assessment for the 2019 tax year will be entered as follows:

| | |
|---|---|
| Land | $2,600,000 |
| Improvement | $7,370,000 |
| Total | $9,970,000 |

For the 2020 tax year, Cedar Grove's average ratio was 93.80%; the lower limit of the common level range was 81.68% and the upper limit of the common level range exceeded 100% and therefore, is 100%. The total assessed value, $11,250,000, to true market value, $10,420,000, yields a ratio of 107.97%, which exceeds 100%. Consequently, the subject property's revised 2020 tax year assessment calculation is as follows:

$$\$10,420,000 \quad x \quad .9380 \ = \ \$9,775,000 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the subject property's local property tax assessment for the 2020 tax year will be entered as follows:


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



| | |
|---|---|
| Land | $2,600,000 |
| Improvement | $7,175,000 |
| Total | $9,775,000 |

### III.  Conclusion

Accordingly, for the above stated reasons, contemporaneously herewith the court will enter judgments reducing the subject property's 2016, 2017, 2018, 2019, and 2020 local property tax assessments.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.

